Harold TRAVERS

v.

John W. PATON, Dr. Sedrick J. Rawlins, Abraham S. Bordon, Charles Stroh, Francis T. Ahearn, Stephen K. Elliott, Rt. Rev. Msgr. Joseph M. Griffin, Boce W. Barlow, Jr., E. Clayton Gengras, Thomas A. Grasso, Frederick G. Reincke, Broadcast-Plaza, Inc.

Civ. No. 10911.

United States District Court
D. Connecticut.
Nov. 25, 1966.

Louis RisCassi, Hartford, Conn., for plaintiff.

Harold M. Mulvey, Atty. Gen., Raymond J. Cannon, Asst. Atty. Gen., Arthur L. Shipman, Jr., Robert Ewing, Hartford, Conn., for defendants.

## RULING ON MOTION FOR SUMMARY JUDGMENT

BLUMENFELD, District Judge.

The plaintiff Harold Travers brought this suit under 42 U.S.C. §§ 1983 and 1985(3) seeking damages for the alleged violation of his civil rights. The claim arises out of a television documentary prepared by the defendant Broadcast-Plaza, Inc. The film was later televised over the defendant Broadcast-Plaza's TV station. The other defendants are the individual members of the Connecticut Parole Board, the members of the Prison Board of Directors, and the warden. Jurisdiction is founded on 28 U.S.C. § 1343.

The facts are not in dispute. The defendant Broadcast-Plaza, Inc. operates WTIC-Channel 3, a television station in Hartford and broadcasts to the surrounding area. As part of its programming, it has presented a documentary series entitled "Connecticut—What's Ahead" describing matters of public interest in the community. On April 22, 1964, the corporate defendant caused to be televised a film entitled "Prison and Parole" describing the facilities and life of an inmate in the new state prison at Somers, Connecticut.

The instant television program had been filmed at the Somers prison during the months of February and March 1964. Almost all areas of the prison were photographed by members of a camera crew who ate their meals in the prison dining room and worked often in full view of the inmates. A portion of the film was concerned with the operation of Connecticut's parole system and included scenes of prisoners being interrogated as prospective or recalcitrant parolees. The plaintiff, an inmate of the prison, was filmed as he appeared for a parole hearing.

Mr. George W. Bowe, Manager of Special Radio and Television Programs for WTIC-TV and producer of the instant program described the manner of filming the parole hearing sequence to which the plaintiff objects:

"The camera was placed in a room adjacent to the hearing room, which was then utilized as an office by prison guards. This room was connected by a door with a small glass panel in the upper half, and the filming was through this panel. The small window was covered whenever inmates entered or left the room so as to conceal the camera. There were no lights or other photographic equipment in the hearing room itself, nor any other cables, wires or similar distracting objects." (Affidavit, p. 3).

The corporate defendant asserts that Travers was not disturbed in his parole interview by the filming, but was rather unaware of the entire operation. Plaintiff does not dispute this point, but argues that the very secrecy of the filming operation made public what plaintiff was led to believe was a confidential interview. The act of the corporate defendant

in filming plaintiff's interview in this allegedly deceptive fashion and in subsequently televising this film is what the plaintiff claims invaded his constitutional right to privacy in violation of 42 U.S.C. §§ 1983, 1985(3).

The defendants have moved for summary judgment, advancing a host of arguments.

■ The question presented is whether the foregoing facts will support a claim under 42 U.S.C. § 1983. This presents "a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy." Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946).

■ Title 42 U.S.C. § 1983 imposes civil liability for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States] * * *."

All torts are not violations of rights "secured by the Constitution and laws." The statute encompasses a much narrower field. This much is clear enough. For the statute to apply, there must be a combination of two ingredients. The tort must be an act in violation of the Constitution or a federal law,[1] and the tortfeasor must have acted under color of law. But if it matters that the act be under color of law, it matters even more what law is violated. Here, the objective of the statute is to permit in federal courts only cases which have valid justification for being litigated in the federal system. As pointed out by Mr. Justice Douglas in Monroe v. Pape, 365 U.S. 167, 180, 81 S.Ct. 473, 480, 5 L.Ed.2d 492 (1961):

"It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies."

Since no "laws" of the United States are involved, the plaintiff's case rests solely on the proposition that the Constitution contains a so-called "right of privacy."[2] This contention begins and ends with Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), for there is no other case support for

---

1. Bomar v. Keyes, 162 F.2d 136 (2d Cir.), cert. denied, 332 U.S. 825, 68 S.Ct. 166, 92 L.Ed. 400, rehearing denied, 332 U.S. 845, 68 S.Ct. 266, 92 L.Ed. 416 (1947), established that a violation of the Civil Rights Act occurs when a person is deprived of a right or privilege secured by a specific federal statute—in that case the right to serve on a federal jury. Judge Learned Hand had this to say:

"Although the books are full of cases under * * * [the Civil Rights] statute concerning deprivation of rights and privileges, secured by the Constitution, we have been unable to find any in which the right or privilege at stake was secured by a 'law' of the United States. Nevertheless the language is so plain that the only question is whether this particular 'law' secured to the plaintiff a 'privilege.'" (162 F.2d at 138–139).

Prisoners have successfully used 42 U.S. C. § 1983 as a basis for relief when they are being deprived of genuine constitutional rights. Pierce v. LaVallee, 293 F. 2d 233 (2d Cir. 1961).

See Note, Section 1983: A Civil Remedy for the Protection of Federal Rights, 39 N.Y.U.L.Rev. 839 (1964). A recent law review note has emphasized that the precise difficulty that prisoners face in their use of the Civil Rights Act sections is making the required showing that a "federal right" has been violated. Note, Constitutional Rights of Prisoners: The Developing Law, 110 U.Pa.L.Rev. 985 (1962).

2. Apart from rights created by specific federal statute, the Civil Rights Act, 42 U.S.C. § 1983, protects only against the deprivation of rights, privileges or immunities secured by the Constitution. Bomar v. Keyes, supra, 162 F.2d 136. Cf. Monroe v. Pape, supra, 365 U.S. 167, 81 S.Ct. 473 (opinion of Mr. Justice Frankfurter); cf. United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). See cases infra n. 18.

the argument.[3] In *Griswold*, the Court was faced with a constitutional attack on Connecticut's antiquated criminal statute barring the use of contraceptive devices. Conn.Gen.Stats. § 53–32. Although recognizing that the Constitution nowhere explicitly mentioned a right of privacy, the Court enunciated a theory of "penumbras" of guaranteed rights whereby the first, third, fourth, and fifth amendment rights were seen to focus on and protect the sanctity of sexual aspects of the marital relationship. The several opinions written are a studied effort to avoid the introduction into the Constitution of a mass of unwritten rights, and they emphasize and re-emphasize that it is the special nature of the marriage bond that makes so patently offensive state intrusion into the area.

> "We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and *intimate to the degree of being sacred."* (Griswold v. Connecticut, supra, 381 U.S. at 486, 85 S.Ct. at 1682) (Emphasis added)

> "The entire fabric of the Constitution and the purposes that clearly underlie its specific guarantees demonstrate that the rights to marital privacy and to marry and raise a family are of similar order and magnitude as the fundamental rights specifically protected." (Griswold v. Connecticut, supra, 381 U.S. at 495, 85 S.Ct. at 1688) (concurring opinion of Justice Goldberg).

It misses the heart and spirit of the *Griswold* case to casually infer an intent to adopt into the Constitution the entire body of the tort law right to privacy.

■ Privacy, however, is an amorphous concept. Basic core aspects of privacy are secured to citizens by the fourth amendment to the Constitution.[4] Indeed, the fourth amendment provisions have been held applicable to the states by the due process clause of the fourteenth amendment. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). But this is privacy in a fundamental and simplistic sense—the right to be secure in one's home against violent and uncivilized intrusions by the police, *ibid,* the right to be protected against official assaults on the privacy of one's person by "methods too close to the rack and the screw." [5] Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

The outer limit of constitutional protection against deprivation of rights which may be within the broadest definition of "privacy" has not been sharply defined. Thus far, only the basic core elements of privacy as found in *Mapp* and *Rochin* are clearly constitutionally protected.[6] Protection does not extend to

3. Petitioner does not merely seek to amplify or embellish the fourth amendment guarantee against unlawful searches. See McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Olmstead v. United States, 277 U.S. 438, 471, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (dissenting opinions); Smadya v. United States, 352 F.2d 251, 256 (9th Cir. 1965), cert. denied, 382 U.S. 981, 86 S.Ct. 555, 15 L.Ed.2d 471 (1966); Brock v. United States, 223 F.2d 681 (5th Cir. 1955).

4. U.S. Const. amend. IV:
   "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

5. "This *is* conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding * * * is bound to offend even hardened sensibilities. * * *" Rochin v. California, supra, 342 U.S. at 172, 72 S.Ct. at 209.

6. Recently the Supreme Court has held the taking of a blood sample by a medical doctor against the individual's will in order to analyze alcoholic content did not violate the fourth amendment. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

all possible ramifications of privacy. Wiretapping curtails one's privacy, but has not so far been counted as a violation of the fourth or fourteenth amendments.[7] Indeed, special legislation was passed to bar a practice Congress thought to be socially undesirable.[8]

The plaintiff argues that defendants' conduct in photographing him and televising his image invades his "privacy." But use of the word in this context has an entirely different heritage from the constitutionally protected right of that name. Photographic privacy was first brought to the attention of the legal profession by an article in the Harvard Law Review in 1890 by Warren and Brandeis.[9] They called this right the "right to be let alone." Previous English cases had dealt with the problem of unauthorized circulation of royal portraitures, et al., for commercial exploitation.[10] These decisions had been based on a theory of breach of contract or breach of confidence. Warren and Brandeis claimed to find in the wellspring of the common law a new right—the right to be let alone—sounding in tort and giving rise to a cause of action in its own name.

The State of Connecticut follows the Warren-Brandeis rationale and recognizes a common law right of action for the invasion of privacy. Korn v. Rennison, 21 Conn.Supp. 400, 156 A.2d 476 (1959); Steding v. Battistoni, 3 Conn. Cir. 76, 208 A.2d 559 (1964). *Cf.* Carey v. Statewide Fin. Co., 3 Conn. Cir. 716, 223 A.2d 405 (1966). In New York, however, the right is purely statutory and severely limited in scope.[11] Since photographic privacy is protected in Connecticut by state common law, in a diversity case a federal court sitting in this state would follow state law and grant suitable relief. Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).[12] However, this would be a vastly different problem from the one facing the court, for this is not a diversity of citizenship case. See 28 U.S.C. § 1332. Simply because the federal courts in other cases have decided questions of law regarding tortious invasions of privacy does not mean that such a case arises under federal law. *Cf.* Leathers Mfr's Bank.v. Cooper, 120 U.S. 778, 781, 7 S.Ct. 777, 30 L.Ed. 816 (1887). The facts of this case have no connection with any *federal* rights, those secured

---

7. Olmstead v. United States, supra, 277 U.S. 438, 48 S.Ct. 564. Constitutional protection does arise, however, if a physical trespass is used to achieve electronic eavesdropping. Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961).

8. Section 605, Federal Communications Act of 1934, 48 Stat. 1103 (1934), 47 U.S.C. § 605 (1964), interpreted in Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937); Benanti v. United States, 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957). See Donnelly, Comments and Caveats on the Wire Tapping Controversy, 63 Yale L.J. 799, 801 (1954).

    New York State has enacted statutes which squarely deal with this problem. N.Y. Penal Law, §§ 738–745; N.Y. Code of Criminal Procedure, § 813–a et seq.; N.Y. Civil Practice Law and Rules § 4506.

9. Warren & Brandeis, The Right to Privacy, 4 Harv.L.Rev. 193 (1890).

10. Prince Albert v. Stranger, 1 McN. & G. (1849); Pollard v. Photographic Co., 40 Ch.D. 345 (1888).

11. A New York statute provides for the maintenance of a suit for an injunction and damages by "any person whose name, portrait or picture is used within this state for advertising purposes or for purposes of trade without * * * written consent * * *." N.Y. Civil Rights Law, § 51. This statute was enacted after the New York Court of Appeals in a now classic case specifically refused to find the existence of a common law right of privacy in New York. Roberson v. Rochester Folding Box Co., 171 N.Y. 538, 64 N.E. 442 59 L.R.A. 478 (1902).

12. In a diversity action involving defamation or invasion of privacy, a federal court will follow applicable state law in determining whether or not to grant relief. Wright v. RKO Radio Pictures, 55 F. Supp. 639 (D.Mass.1944); Werner v. Hearst Pub. Co., 297 F.2d 145 (9th Cir. 1961). *Cf.* Hazlitt v. Fawcett Pub., Inc., 116 F.Supp. 538 (D.Conn.1953).

by the Constitution and laws of the United States. *Cf.* Assoc. for the Preservation of Freedom of Choice Inc. v. Simon, 299 F.2d 212, 214 (2d Cir. 1962).[13] Nor is there any "federal general common law," Erie R. R. Co. v. Tompkins, supra, 304 U.S. at 78, 58 S.Ct. 817, which recognizes an action for invasion of photographic privacy.

A recent case in the Ninth Circuit [14] allowed a citizen to sue under § 1983 for an invasion of her privacy. The plaintiff therein was a complainant in an indecent assault case. She reported the incident to the police. Over her objection, she was required by them to pose naked for photographs in indecent postures. These photographs were later circulated among police officers for other than evidentiary purposes. The Court of Appeals by a divided court held that these acts constituted an invasion of personal privacy guaranteed by the due process clause of the fourteenth amendment and stated a cause of action under § 1983. York v. Story, supra, 324 F.2d at 455, n. 10.

The *York* case is distinguishable. There, the photographic intrusions were so shocking [15] that "our polity will not endure it," Palko v. Connecticut, 302 U.S. 319, 328, 58 S.Ct. 149, 153, 82 L.Ed. 288 (1937), and revelations were so unwarranted in view of the victim's situation as a complainant as to outrage the community's notions of decency. *Cf.* Rochin v. California, supra, 342 U.S. at 172, 72 S.Ct. 205. Furthermore, the court pointed to the fact that the plaintiff had been ordered by the police to pose in the nude for photographs over her objection and without any legitimate purpose. This was held to be an infringement of her constitutionally guaranteed liberty. York v. Story, supra, 324 F.2d at 455, n. 9.

A case closer in point is Mattheis v. Hoyt, 136 F.Supp. 119 (W.D.Mich.1955), where a state prisoner sought leave to commence a suit in forma pauperis in federal court under the Civil Rights Act. The prisoner sought damages against the police chief and magazine publisher for a publication of plaintiff's prior criminal escapades together with allegedly false statements wherein plaintiff admitted his guilt. The District Court dismissed the complaint, holding that the facts failed to state a claim under § 1983 in that the plaintiff had not been deprived of any specific constitutional or federal rights.[16]

---

13. See also cases infra n. 18.

14. York v. Story, 324 F.2d 450 (9th Cir. 1963), cert. denied, 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964).

15. "We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity. * * *

"Nor can we imagine a more arbitrary police intrusion upon the security of that privacy than for a male police officer to unnecessarily photograph the nude body of a female citizen who has made complaint of an assault upon her, over her protest that the photographs would show no injuries, and at a time when a female police officer could have been, but was not, called in for this purpose * * *." York v. Story, supra, 324 F.2d at 455.

The *York* case involved both a restraint of plaintiff's liberty and grossly obscene conduct. The case cannot be cited as creating a general right of privacy protected by the Civil Rights Act in the absence of these extreme circumstances. See Pound, The Fourteenth Amendment and the Right of Privacy, 13 W.Res.L. Rev. 34, 54–55 (1961).

16. "The Constitution and Federal laws do not guarantee or protect the plaintiff, a convicted murderer, against publication of his picture and the accompanying article relating to the commission of the crime and his conviction thereof, even though. the publication may have contained an allegedly false statement as to his admission of guilt. His complaint in his proposed action sets forth no specific facts showing a conspiracy by the defendants, nor does it allege any facts showing a deprivation of any of his rights, privileges or immunities under the Constitution and Federal laws. Therefore, his complaint fails to state a claim entitling him to relief under the Federal civil rights statutes." Mattheis v. Hoyt, supra, 136 F.Supp. at 124.

The reluctance of federal courts to indiscriminately extend federal jurisdiction over state torts under the aegis of § 1983 finds support in reasoning, legislative history of the act[17] and relevant authority.[18] There are protected rights whose violation gives rise to claims for damages only where the right is necessary to preserve or effectuate some provisions of the Constitution or specific federal law. *Cf.* Bomar v. Keyes, supra, 162 F.2d 136. In similar vein, the Supreme Court has very recently favored a narrow construction of federal removal provisions, 28 U.S.C. § 1443, refusing to allow indiscriminate removal of state criminal proceedings to federal court.[19]

■ Because plaintiff's claims cannot be supported under the Civil Rights Act, 42 U.S.C. § 1983, it would not ordinarily be necessary to reach the merits of the claim as based on Connecticut's common law. *Cf.* O'Neill v. Maytag, 339 F.2d 764, 767 (2d Cir. 1964). See Rogers v. Provident Hospital, 241 F.Supp. 633, 639 (N.D.Ill.1965). However, both sides have met on the issues raised by the defendants' motion for summary judgment. Since undisputed facts have been presented on the merits and since there is no genuine issue as to any material fact relating to the furthest reaches of the plaintiff's claim, it is not inappropriate to decide this case in its entirety on the basis of pendent jurisdiction.

■ The concept of pendent jurisdiction authorizes a federal court, when confronted with a claim for relief cognizable under both federal and state law, to decide the question of state law even though it finds against the validity of the federal claim. Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933).[20]

17. See the dissenting opinion of Mr. Justice Frankfurter in Monroe v. Pape, supra, 365 U.S. at 202, 81 S.Ct. 473.

18. Temple v. Pergament, 235 F.Supp. 242, 244 (D.N.J.1964), aff'd, 343 F.2d 474 (3d Cir. 1965); Bradford v. Lefkowitz, 240 F.Supp. 969, 976–977 (S.D.N.Y.1965); Mattheis v. Hoyt, supra, 136 F.Supp. 119; Shakespeare v. Wilson, 40 F.R.D. 500 (S.D.Cal.1966).

Neither does a tort under state law necessarily involve the deprivation of a federal right so as to give rise to a cause of action under the general federal question statute. 28 U.S.C. § 1331. Lyons v. Weltner, 174 F.2d 473 (4th Cir. 1949).

19. City of Greenwood v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966). The Court suggested § 1983 as an alternative remedy to removal, but limited § 1983 to "violations of rights conferred by federal equal civil rights laws [and to] * * * violations of other federal constitutional and statutory rights * * *." (384 U.S. at 829–830, 86 S.Ct. at 1813).

20. The *Hurn* doctrine is permissive, not mandatory. See 61 Harv.L.Rev. 362 (1948). Its application has not been extensive, nor its rationale and guidelines sharply defined. See Judge Magruder's concurring opinion in Strachman v. Palmer, 177 F.2d 427, 431, 12 A.L.R.2d 687 (1st Cir. 1949). See also Note, The Evolution and Scope of the Doctrine of Pendent Jurisdiction in the Federal Courts, 62 Colum.L.Rev. 1018 (1962).

But there must be some substance to the federal claim for pendent jurisdiction to attach. If a federal court were to reach the merits of a claim under state law on the allegation of a merely colorable or frivolous federal claim, see Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 105–106, 53 S.Ct. 549, 77 L.Ed. 1062 (1933), one would have a case where "the dog would be wagged by his tail." Hart & Wechsler, The Federal Courts and the Federal System, 808. See T. B. Harms Co. v. Eliscu, 339 F.2d 823, 828–829 (2d Cir. 1964), cert. denied, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965); McFaddin Express, Inc. v. Adley, Corp., 346 F.2d 424, 427 (2d Cir. 1965), cert. denied, 382 U.S. 1026, 86 S.Ct. 643, 15 L.Ed.2d 539 (1966). The jurisdiction over state claims is purely ancillary; such a claim must ride into federal court on the coattails of a cognizable federal claim.

The rationale of the *Hurn* doctrine is economy of judicial time. Wright, Federal Courts, 57. Where evidence has been presented to the court on the federal claim and is determinative of the issues in the state claim, a refusal to decide the state claim would serve only to delay justice and promote piecemeal litigation. Provided the federal claim is not plainly unsubstantial, *cf.* Bell v. Hood, supra, 327 U.S. 678, 66 S.Ct. 773 and that the state claim is but another theory of relief on the same operative evidentiary facts, the federal court has pendent jurisdiction to decide the case on state law grounds.

Even if the facts might be held to constitute an invasion of the privacy of a full-fledged citizen, an average member of the community, no actionable invasion occurs if the subject of such publicity is a prisoner. A prisoner becomes a public figure by virtue of his crime and subsequent trial. Restatement, Torts § 867, Comment c. He remains a public figure during his imprisonment or until he has "reverted to the lawful and unexciting life led by the great bulk of the community." In the instances where prisoners have sued in federal court[21] alleging invasion of privacy in the publication or broadcasting of a version of their crime, the courts have denied relief on the grounds that prisoners are public figures in whose misadventures the community has a consuming interest.[22] Although there are no Connecticut cases in point, there is no reason to believe that Connecticut's courts would deviate from this prevailing view.

Finally, it is hard to believe that a jury or court would find that his reputation has been injured or that he has endured any pain or suffering to support an award of compensatory damages.

A viewing of the film in controversy only buttresses this conclusion. The production was a factual portrayal of the operation of our Connecticut prison system. Prisoners were shown in the various projects designed to stimulate their rehabilitation. However, great care was taken by the cameramen and editors to keep the identities of the filmed convicts secret. Only backs or shadows or some other oblique view was seen, and, in one instance, a prisoner was depicted, front angle, working at a lathe but with his head totally edited out of the picture. The recordings taken at the parole hearings were equally anonymous. One could see only the back of a man facing the three members of the parole committee. Furthermore, the discussion picked up by the hidden microphones was of such a general nature that the sole clue to the prisoner's identity was the sound of his voice. So far as the viewer was concerned, the plaintiff was nameless and faceless. In any event, the true identity of the prisoner appearing before the board was of no significance. It is extremely improbable that anyone would pay any attention to it.

The defendants are entitled to judgment on the merits.

In view of this disposition of the case,[23] there is no need to consider the further defense of official immunity, or the claim that the officials cannot be sued in a federal court because of the eleventh amendment.

The court expresses its appreciation to Mr. Louis RisCassi, court-appointed counsel, for his able and assiduous representation of the plaintiff.

Hurn v. Oursler, supra, 289 U.S. 238, 53 S.Ct. 586. See Note, 62 Colum.L.Rev. 1018 (1962).

In the instant case, the court viewed the film of the television program at the request of both parties and received affidavits and briefs on the nature of the alleged invasion of privacy. A consideration of and decision on the issues of state common law in the instant case is well within the rationale of pendent jurisdiction and will result in economy of judicial time.

21. Jurisdiction was based on diversity of citizenship. 28 U.S.C. § 1332.

22. Bernstein v. NBC, 129 F.Supp. 817 (D.D.C.1955), aff'd, 98 U.S.App.D.C. 112, 232 F.2d 369 (1956); Miller v. NBC, 157 F.Supp. 240 (D.Del.1957); Raynor v. ABC, 222 F.Supp. 795 (E.D.Pa.1963). On the public's continuing interest in once famous figures see Sidis v. F–R Pub. Co., 113 F.2d 806 (2d Cir. 1940).

23. Inasmuch as the complaint fails to state a cause of action under 42 U.S.C. § 1983, the court need not consider the argument that defendant Broadcast-Plaza, Inc. violated 42 U.S.C. § 1985(3) in conspiring with state officials to deprive plaintiff of his civil rights.