**UNITED STATES of America, Plaintiff,**

v.

**Earl E. NELSON, Defendant.**

**No. G78–116 CR.**

United States District Court,
W. D. Michigan, S. D.

Feb. 28, 1980.

942

James S. Brady, U. S. Atty., Grand Rapids, Mich., for plaintiff.

William Waterman, Pontiac, Mich., for defendant.

## THE CASE

HILLMAN, District Judge.

The defendant, Earl Nelson, was indicted by a federal grand jury for making materially false statements on a loan application to a federally insured bank in violation of 18 U.S.C. § 1014. Acting upon motion of the defendant, Chief Judge Noel P. Fox dismissed the indictment due to insufficiency of the evidence and because enforcement of 18 U.S.C. § 1014 was held to violate the defendant's privacy rights. The United States Attorney moved to have the indictment reinstated. The case was subsequently reassigned by Judge Fox, and the matter is currently before me. I grant the Government's motion.

## THE FACTS

On October 26, 1973, in the City of Lansing, Michigan, Earl E. Nelson, a former Michigan state senator, submitted a loan application to the Bank of Lansing, the deposits of which were insured by the Federal Deposit Insurance Corporation. As security for the loan, the application included a promissory note in the amount of $6,872.40, which was purportedly signed by both the defendant and his wife, Phyllis Nelson. Also included as security was a real estate mortgage on property jointly owned by the Nelsons which likewise appeared to contain both parties' signatures.

The indictment charges that Phyllis Nelson's signature was in fact fraudulent and was signed by an unknown third party. It further alleges that this forgery occurred at the defendant's direction. For this reason, Nelson was charged with making a materially false statement in a loan application to a bank insured by the F.D.I.C., the purpose of which was to influence the bank's approval of the loan, in violation of 18 U.S.C. § 1014, which reads in part:

"Whoever knowingly makes a false statement or report . . . for the purpose of influencing in any way the action of . . . any institution the accounts of which are insured by . . . the Federal Deposit Insurance Corporation . . . upon any application . . . commitment, or loan . . . shall be fined not more than $5,000 or imprisoned not more than two years, or both."

At the time Nelson submitted the loan application, he and his wife had been separated for over six months and were living apart. Moreover, in June of 1976, subsequent to the loan application, Mrs. Nelson filed for and received a divorce. At no time, however, did the defendant inform his wife of the loan application or of her forged signature, even though the divorce decree awarded her the property which earlier had been offered as security.

On June 21, 1978, following the Nelsons' divorce, Phyllis Nelson testified before the grand jury concerning her knowledge of the October, 1973, loan application. When asked by the United States Attorney whether she had authorized her husband to sign on her behalf, she responded as follows:

"Q. And on the back side, this is a copy, and it appears to be the signature of Earl E. Nelson and Phyllis A. Nelson. Did you sign that document?

A. No, I didn't.

Q. Did you know anything about this?

A. No, I didn't.

Q. Is that your signature?

A. No, it isn't.

Q. Did you authorize your husband to sign that on your behalf or authorize anybody else to sign?

A. I knew nothing of it."

The grand jury indicted the defendant on June 26, 1978.

Nelson subsequently alleged that the indictment was defective because the grand jury received testimony which purportedly violated the defendant's marital privilege. Specifically, he claimed that Phyllis Nelson's testimony concerning Nelson's authority to sign on her behalf revealed "confidential communications" arising out of the marital relationship. Because of this alleged violation of the defendant's rights, Nelson argued, the indictment should be dismissed.

In an opinion and order issued on June 29, 1979, Senior Judge Noel P. Fox, then Chief Judge of the U. S. District Court for the Western District of Michigan, granted defendant's motion and dismissed the indictment. In his opinion, Judge Fox determined that Phyllis Nelson was "evasive" in her answer to the prosecutor's question, "Did you authorize your husband to sign that on your behalf or authorize anybody else to sign?" Judge Fox concluded that because no evidence existed before the grand jury demonstrating a lack of authority on Nelson's part to sign on his wife's behalf, the grand jury was without probable cause to indict. Alternatively, the court decided that enforcement of 18 U.S.C. § 1014 would require investigation into the existence of spousal agency, determined to be an intimate and privileged aspect of the Nelsons' marriage. The court consequently held that where enforcement of what is essentially a commercial statute conflicts with a defendant's right to marital privacy, the resulting indictment has been unconstitutionally obtained.

Subsequent to the government's motion for reconsideration, the case was reassigned by Judge Fox. Because the matter is currently before me, and for the reasons that follow, I have decided to reinstate the indictment.

## DISCUSSION

### I.

■ The court first addresses the question of whether or not the grand jury had before it enough evidence on which to indict.

In its previous opinion, this court determined that Phyllis Nelson, by answering, "I knew nothing of it", was evasive when she responded to the prosecutor's question concerning her husband's authority to sign in

her place. For this reason, the court concluded that the grand jury was without sufficient evidence to indict because "Nelson may very well have presumed implicit authority to deal with the property of his wife, and their joint property, as required by any given set of circumstances."

I cannot agree, however, that this reply was in fact evasive. In the context of the interrogation, Mrs. Nelson's answer very simply expresses her lack of knowledge about the loan application and her failure to authorize her husband to act as her proxy. Had she answered, "I don't remember" or "I can't say", the situation might have been different. Here, however, when asked, "Did you authorize your husband to sign that (the loan application) on your behalf or authorize anybody else to sign?" she replied: "I knew nothing of it." This answer, in my judgment, is as clear and unambiguous as though she had simply replied: "No". I therefore conclude that sufficient evidence was received by the grand jury for it to decide that the allegedly fraudulent signature was unauthorized.

The court must be especially cautious in second guessing the quality of evidence before the grand jury. While reviewing the grand jury's finding of probable cause is well within the equity powers of a federal court, I am satisfied that such powers should be sparingly employed. Otherwise, as Justice Black warned, in *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956):

> "If indictments were to be held open to challenge on the grounds that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by [a] prosecutor, if valid on its face, is enough

to call for a trial of the charge on the merits. The Fifth Amendment requires nothing more."

## II.

Even assuming that no competent evidence was presented to the grand jury relating to the question of Mrs. Nelson's authorization to sign, for several reasons I cannot agree that sufficient grounds exist for dismissing the indictment.

First, although Nelson may have presumed that he had authority to negotiate his wife's property, a factual question concerning the defendant's knowledge and intent, lack of authority to sign is a defense to be raised at trial, and is not an element of § 1014 which the government is obliged to prove. *See, United States v. Carr*, 582 F.2d 242 (2nd Cir. 1978), where a defendant's conviction for forging the name of another person on a loan application was upheld over the defendant's objection that lack of authorization was an element of a § 1014 crime. To the contrary, the court noted at p. 245:

> "Significantly, neither party has produced a case in which it was held that an element of a Section 1014 crime is the defendant's lack of authorization. That the statute has never been so interpreted is doubtless due to the defendant's easier access to the underlying facts . . ."

As set out by the court in *United States v. Kernodle*, 367 F.Supp. 844 (M.D.N. C.1973), *aff'd* 506 F.2d 1398 (4th Cir. 1974), the essential elements of 18 U.S.C. § 1014 are: (1) the making of a false statement or report on any application . . . commitment, or loan; (2) knowing that such statement is false; and (3) for the purpose of influencing in any way the action of any bank the deposits of which are insured by the Federal Deposit Insurance Corporation.

The indictment at hand sufficiently alleges these elements. Therefore, failure by the government to establish before the grand jury Nelson's lack of authority to sign on behalf of his wife should not bar the government from trying the defendant as charged.

Moreover, even if the government was obliged to show that the defendant lacked authority to sign on behalf of his wife, I conclude that in this particular case, absence of any competent evidence relating to this issue would not compel dismissal of the indictment.

■ The question of spousal agency is one to be determined by state law. *See, De Sylva v. Ballentine,* 351 U.S. 570, 580, 76 S.Ct. 974, 980, 100 L.Ed. 1415 (1955) where Justice Harlan said:

"The scope of a federal right is, of course, a federal question, but that does not mean that its content is not to be determined by state, rather than federal law. Cf. *Reconstruction Finance Corp. v. Beaver County,* 328 U.S. 204 [, 66 S.Ct. 992, 90 L.Ed. 1172]; *Board of County Commissioners v. United States,* 308 U.S. 343, 351–352 [, 60 S.Ct. 285, 288–289, 84 L.Ed. 313]. This is especially true where a statute deals with a familial relationship; there is no federal law of domestic relations, which is primarily a matter of state concern."

The established precedent in Michigan is firmly against a presumption of one spouse acting as an agent for the other. In this respect, see *Fechheimer v. Peirce,* 70 Mich. 440, 38 N.W. 325 (1888), where the Supreme Court of Michigan, in reversing a judgment of liability against a defendant whose husband secured a loan by guaranteeing her as a surety, said at p. 441, 38 N.W. at p. 326:

"It is the law of this state that a married woman can make no obligation except on account of her own property, and that any one seeking to hold her must make out an affirmative case. It is also well settled that there can be no presumption of a husband's authority to act for his wife, and that a person seeking to hold her for acts done by another must show affirmatively full authority to bind her."

■ Moreover, it is equally well established in Michigan that the issue of agency is a question of fact for the jury, and that the burden of proof is on the party asserting it as a defense. *Albrecht v. Pfeiffer,* 298 Mich. 721, 299 N.W. 780 (1941). The Michigan Supreme Court has also ruled, in *Three Rivers National Bank v. Gilchrist,* 83 Mich. 253, 255, 47 N.W. 104, 105 (1890), that the authority of a husband to act on behalf of his wife "cannot be legally shown by proof of his own declarations on that subject", and that such authority is not to be presumed from the circumstances, but must be proved by competent legal evidence. Therefore, absence of evidence before the grand jury relating to Nelson's authority to sign, cannot be grounds on which to dismiss the present indictment.

■ As already noted, a "defendant has no right to have an indictment dismissed merely because incompetent or inadequate evidence was received by the Grand Jury." *United States v. Tane,* 329 F.2d 848, 853 (2nd Cir. 1964). The possibility of successfully challenging an indictment on grounds of insufficiency of the evidence was largely foreclosed by the 1956 Supreme Court decision in *Costello v. United States, supra,* where a defendant's income tax evasion conviction was affirmed even though it became apparent at trial that all of the witnesses testifying in support of the government's net worth theory had themselves never appeared before the grand jury.

This is not to say that indictments can never be dismissed for insufficiency of the evidence. For example, in *United States v. Tane, supra,* the grand jury's indictment was dismissed upon the government's admission that virtually all of the evidence before the grand jury had been illegally obtained. On the other hand, in the instant case the grand jury had before it competent evidence relating to the essential elements of a § 1014 crime. For this reason, dismissal of the indictment is not warranted.

III.

Dismissal of the indictment may be warranted, however, for an alternative reason which is unrelated to the sufficiency of the evidence before the grand jury. Dismissal would be appropriate upon the court's determination that under the present set of circumstances enforcement of § 1014 violates the defendant's right to privacy.

This is in fact the conclusion reached by Judge Fox in his earlier opinion. There, it was determined that because the success or failure of the present prosecution depends upon the nature of Nelson's marital relationship, enforcement of § 1014 impermissibly violates the defendant's expectation of privacy.

I agree that protection of the family, and of marital relationships, is one of the highest priorities of the law. As Justice Harlan wrote in *Poe v. Ullman*, 367 U.S. 497, 551–552, 81 S.Ct. 1752, 1781–82, 6 L.Ed.2d 989:

"The home derives its pre-eminence as the seat of family life and the integrity of that life is something so fundamental that it has been found to draw to its protection of the principles of more than one explicitly granted Constitutional right. . . . Of this whole private realm of family life it is difficult to imagine what is more private, or more intimate than a husband and wife's marital relations."

Moreover, I agree that a crucial issue here is whether the defendant had his wife's authority to sign for her on her behalf. Admittedly, this is an issue concerning Nelson's marital relationship which "is initially and foremost a matter between the marital partners". I cannot agree, however, that it is no business of the government whether or not a breach of their mutual understanding has occurred.

As Justice Blackmun stated in *Roe v. Wade*, 410 U.S. 113, pp. 152–153, 93 S.Ct. 705, pp. 726–27, 35 L.Ed.2d 147 (1973), the right to privacy is not expressly mentioned in the Constitution:

"The Constitution does not explicitly mention any right of privacy. In a line of decisions, however, going back perhaps as far as *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251 [, 11 S.Ct. 1000, 1001, 35 L.Ed. 734] (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution. In varying contexts, the Court or individual Justices have, indeed, found at least the roots of that right in the First Amendment, *Stanley v. Georgia*, 394 U.S. 557, 564 [, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542] (1969); in the Fourth and Fifth Amendments, *Terry v. Ohio*, 392 U.S. 1, 8–9 [, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889] (1968), *Katz v. United States*, 389 U.S. 347, 350 [, 88 S.Ct. 507, 510, 19 L.Ed.2d 576] (1967), *Boyd v. United States*, 116 U.S. 616 [, 6 S.Ct. 524, 29 L.Ed. 746] (1886), see *Olmstead v. United States*, 277 U.S. 438, 478 [, 48 S.Ct. 564, 572, 72 L.Ed. 944] (1928) (Brandeis, J., dissenting); in the penumbras of the Bill of Rights, *Griswold v. Connecticut*, 381 U.S. [479], at 484–485 [, 85 S.Ct. 1678, 1681–1682, 14 L.Ed.2d 510], in the Ninth Amendment, *id.*, at 486 [, 85 S.Ct. at 1682] (Goldberg, J., concurring); or in the concept of liberty guaranteed by the first section of the Fourteenth Amendment, see *Meyer v. Nebraska*, 262 U.S. 390, 399 [, 43 S.Ct. 625, 626, 67 L.Ed. 1042] (1923). These decisions make it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' *Palko v. Connecticut*, 302 U.S. 319, 325 [, 58 S.Ct. 149, 152, 82 L.Ed. 288] (1937), are included in this guarantee of personal privacy. They also make it clear that the right has some extension to activities relating to marriage, *Loving v. Virginia*, 388 U.S. 1, 12 [, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010] (1967); procreation, *Skinner v. Oklahoma*, 316 U.S. 535, 541–542 [, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655] (1942); contraception, *Eisenstadt v. Baird*, 405 U.S. [438], at 453–454 [, 92 S.Ct. 1029, 1038–1039, 31 L.Ed.2d 349]; *id.*, at 460, 463–465 [, 92 S.Ct. at 1042, 1043–1044] (WHITE, J., concurring in result); family relationships, *Price v. Massachusetts*, 321 U.S. 158, 166 [, 64 S.Ct. 438, 442, 88 L.Ed. 645] (1944); and child rearing and education, *Pierce v. Society of Sisters*, 268 U.S. 510, 535 [, 45 S.Ct. 571, 573, 69 L.Ed. 1070] (1925), *Meyer v. Nebraska, supra.*"

Although the right to privacy "does not extend to all possible ramifications of privacy", *Travers v. Paton*, 261 F.Supp. 110, 113–114 (D.Conn.1966), enforceable privacy in-

terests may arise where defendants exhibit some real expectation of privacy in their personal affairs, and where society is prepared to recognize and enforce those interests. *See, Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Justice Harlan, concurring).

■ Undoubtedly, society is prepared to recognize and enforce privacy interests in marriage. Not every aspect of the marital relationship, however, is protectively treated. Instead, where marital privacy is threatened by society's right to receive "every man's evidence" in enforcing its criminal laws, federal courts have created testimonial privileges designed to balance those interests and to protect marital relationships. As Justice Stone noted in *Wolfle v. United States*, 291 U.S. 7, 14, 54 S.Ct. 279, 280, 78 L.Ed. 539 (1933):

> "The basis of the immunity given to communications between husband and wife is the protection of marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails."

*See also* 3 *Jones on Evidence* § 21:1 at 745–746 (6th Ed. 1972), where the author states:

> "The mere fact that matters are treated as confidential between the parties does not insulate them from the reach of the courts as evidence. Ethical restraints against disclosure of confidences are not synonymous with legal restraints placed thereon, and the two rest upon entirely different considerations. For example a physician may have ethical compunctions against testifying about his patient's ailments in the court to which he was subpoenaed, but such compunctions will not excuse him from testifying if his patient has done anything to waive the privilege which rests in the patient, or if the physician-patient privilege is not recognized in the jurisdiction where the court sits.
>
> The public interest is best served by the paramount requirement that all facts relevant to a litigated issue should be available to the court to the end that the truth may be ascertained. Thus ordinarily the sanctity of confidence must yield to the necessity of getting all the facts, and it is only in a few rare relationships that the public policy of protecting the relationship overrides the public policy of unrestricted inquiry."

■ In federal courts, the right to privacy in marriage is protected by way of two distinct privileges. The first privilege bars any testimony by one spouse which is contrary to the interests of the other. It is inapplicable, however, where marital partners are divorced. *See, United States v. Cameron*, 556 F.2d 752 (5th Cir. 1977). Consequently, because Mrs. Nelson is divorced from the defendant, Nelson cannot invoke that privilege to bar her testimony in this case.

The second privilege bars spouses and ex-spouses from testifying about confidential communications which arose out of the marital relationship. This second privilege, however, does not prevent testimony about communications which were not or were never intended to be confidential. For example, communications which were not oral statements, or which were made to third parties, are not privileged. Nor are communications privileged which were spoken in situations where the testifying spouse has been a victim of the alleged criminal act. In this respect see *Pereria v. United States*, 347 U.S. 1, 6, 74 S.Ct. 358, 361–62, 98 L.Ed. 435 (1953), where Chief Justice Warren described:

> "Petitioners do not now contend that Mrs. Joyce was not a competent witness against her ex-husband. They concede that the divorce removed any bar of incompetency. That is the generally accepted rule. Wigmore, Evidence, § 2237; 58 Am.Jur., Witnesses, § 204. Petitioners rely on the proposition that while divorce removes the bar of incompetency, it does not terminate the privilege for confidential marital communications. Wigmore, Evidence, § 2341(2); 58 Am.Jur., Witnesses, § 379. This is a correct statement of the rule, but it is inapplicable to bar the

communications involved in this case, since under the facts of the case, it cannot be said that these communications were confidential. Although marital communications are presumed to be confidential, that presumption may be overcome by proof of facts showing that they were not intended to be private. *Blau v. United States*, 340 U.S. 332 [, 71 S.Ct. 301, 95 L.Ed. 306]; *Wolfle v. United States*, 291 U.S. 7 [, 54 S.Ct. 279, 78 L.Ed. 539]. The presence of a third party negatives the presumption of privacy. Wigmore on Evidence, § 2336. So too, the intention that the information conveyed be transmitted to a third person. *Id.*, § 2336. The privilege, generally, extends only to utterances, and not to acts. *Id.*, § 2337."

*See also, Tabbah v. United States*, 217 F.2d 528 (5th Cir. 1954) (statements not intended to be confidential); *United States v. Long*, 468 F.2d 755 (8th Cir. 1972) (utterances); *Grulkey v. United States*, 394 F.2d 244 (8th Cir. 1968) (spouse as victim).

■ The only privacy interests the defendant retained in his prior marriage which society is prepared to recognize and enforce and which would consequently prevent introduction of evidence designed to establish the defendant's guilt in this proceeding, are those aspects of his prior marriage which are protected by the confidential communications privilege discussed in *Pereria v. United States, supra.* As noted, however, the confidential communications privilege does not apply to every communication made within the parameters of the marriage relationship, but only to a select few. I hold that Mrs. Nelson's testimony relating either to the existence or absence of spousal agency is not testimony about a protected communication.

In this case, authorization to sign cannot be considered "confidential". Presuming that Mrs. Nelson did in fact empower her husband to act as her agent in obtaining a bank loan, she would have intended publication, not secrecy. Under these circumstances, no one would transact with an agent whose principal forbade him from disclosing

the fact that he was a proxy. Nor would one likely act as agent under such conditions. Whether by statute or case law, this is the rule applied in nearly every American jurisdiction. *See* 3 *Jones on Evidence* § 21:5 at 755; Annot. 4 A.L.R.2d 835, 843 (1949). It is also the rule which will apply in this case.

Moreover, in the present context, it appears that Phyllis Nelson was the victim of Nelson's alleged crime. If Nelson, in fact, caused his wife's name to be forged onto the bank documents, the encumbrance of Phyllis Nelson's property is as much an injury to her interests as it is an injury to the interests of the government. Mrs. Nelson, therefore, might be denied the opportunity to clear the title of the property she received in the divorce settlement if her testimony is prevented.

For these reasons, this court is not prepared to hold that enforcement of § 1014 impermissibly violates the defendant's interests in the privacy of his former marriage. Moreover, because enforcement of § 1014 does not offend the defendant's privacy interests, I conclude that dismissal of the indictment in this case is unwarranted. A contrary result would be anomalous. For example, had Nelson signed a loan application form in name of his wife and himself in which he had fraudulently overestimated the couple's net worth, and had the government prosecuted both parties as violators of § 1014, under a contrary rule, Phyllis Nelson would be precluded from defending herself by denying the existence of spousal agency. I cannot believe that Congress or society would intend such a result. Indeed, an analogous problem arose in *Barton v. United States*, 407 F.2d 1155 (10th Cir. 1969), where the defendant, a nurse charged with defrauding a credit union by underestimating her debts and by listing herself as a "widow," sought to defend against the charge by alleging that her husband coerced her actions. The Tenth Circuit, however, found no impropriety in the defendant's having testified at trial with respect to these matters which occurred during the marital relationship in her unsuccessful at-

tempt to shift the responsibility for her actions onto her husband.

Consequently, for this reason and for those set out in other parts of this opinion, I grant the prosecution's motion for reconsideration, and I reinstate the June 26, 1978, indictment against the defendant Earl E. Nelson.