**Rosann C. SCHEETZ and Kenneth L. Scheetz, Jr.**

v.

**The MORNING CALL, INC., Terry L. Mutchler, and John Doe and/or Jane Doe.**

**Civ. A. No. 89–6755.**

United States District Court, E.D. Pennsylvania.

Oct. 1, 1990.

James T. Huber, Huber & Waldron, Allentown, Pa., for plaintiffs.

Malcolm J. Gross, Gross, McGinley, LaBarre & Eaton, Allentown, Pa., for defendants.

## MEMORANDUM

CAHN, District Judge.

The plaintiffs, an Allentown police officer and his wife, have sued the defendants, an Allentown newspaper, one of its reporters, and an unidentified Allentown police officer, under 42 U.S.C. § 1983 for violating their constitutional right to privacy by publishing the contents of a confidential police report, and under various state laws and constitutional provisions. The plaintiffs seek an order compelling the reporter and an editor of the defendant newspaper to divulge the identity of the informant who supplied the reporter with the confidential report. The newspaper and reporter oppose this motion, claiming that the informant's identity is privileged. They have also moved for summary judgment on the counts of the complaint that pertain to them and to dismiss the counts that pertain to Officer Doe. This court shall grant the motion for summary judgment, deny the motion to compel, and grant the motion to dismiss.

The background has been laid out in an earlier opinion. *Scheetz v. Morning Call, Inc.,* 130 F.R.D. 34, 35 (E.D.Pa.1990). Kenneth Scheetz, an Allentown police officer, was named officer of the year. Shortly after, Terry Mutchler, a reporter for *The Morning Call,* requested the offense report and investigative reports for a ru-

mored assault by Officer Scheetz upon Mrs. Scheetz over a year before. Chief Stephens denied this request. *The Morning Call* soon after published two stories which disseminated the contents of confidential police investigative reports regarding Mrs. Scheetz's complaint that her husband had assaulted her.[1] The first story (Appendix A to this opinion) contained most of the information found in the investigative reports, including a description of Mrs. Scheetz's injuries, Mrs. Scheetz's statement that she had been assaulted before, and her statement that her husband had refused to seek counseling. The story noted, using information drawn from a second investigative report, that the Scheetzes had since sought counseling. The second story (Appendix B) provided no new material from the reports. Instead, it repeated a description of the effects of the beating.

Officer and Mrs. Scheetz then filed this action under 42 U.S.C. § 1983. Counts I, V, and IX claim that the defendants (Morning Call, Inc., the publisher of *The Morning Call,* Terry Mutchler, the reporter who wrote the stories in question, and John and/or Jane Doe, unknown police officials who conspired with Mutchler to release the confidential report, respectively), violated their constitutional right to privacy.[2] Mutchler is alleged to have conspired with Doe to obtain police investigative reports denied her by the Chief of Police, with the object of publishing them in *The Morning Call,* also part of this conspiracy. The plaintiffs also assert pendent state claims for violations of the Pennsylvania Constitution and for the torts of invasion of privacy through publication of private facts and false-light invasion of privacy.

Through interrogatories and depositions, the plaintiffs sought to discover the identity of the informant (defendant Doe) who

---

1. Mrs. Scheetz dropped the complaint, so no charges were filed.

2. The Scheetzes maintain that the conduct violated their federal constitutional rights to privacy, expression, speech, association, and due process as protected by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the Constitution. However, no subsequent briefs refer to the rights of expression, association and due

process, and neither legal argument nor competent evidence has been directed to these claims. Although the plaintiffs maintain that these articles have chilled their speech, because they are now reluctant to seek therapy for fear that this fact will be publicized in *The Morning Call,* their speech on *public* issues or in *public* fora has not been chilled. This court shall therefore address only the privacy claims.

supplied the named defendants with the police report and facts regarding the reportorial and editorial processes that underlay the publication of the stories that divulged the confidential information. The deponents, Terry Mutchler, a reporter, and David Migliore–Erdman, an editor, declined to answer these questions, claiming that the questions fell within the area covered by their reportorial and editorial privileges. The plaintiffs then filed a motion to compel. Besides a response, Mutchler and Morning Call filed motions for a protective order, for summary judgment, for judgment on the pleadings, and to dismiss.[3] This court heard extensive argument on June 25, 1990. Its jurisdiction rests upon 28 U.S.C. § 1343, with pendent jurisdiction over the state claims.

## I. MOTION FOR SUMMARY JUDGMENT

■ Before this court can address the substance of this motion, it must face the motion for a protective order filed by the defendants. The defendants argue that the summary judgment motion should be decided before the motion to compel is resolved, because a grant of summary judgment would eliminate what need there might be to breach the privilege they assert. In contrast, the plaintiffs argue that the motion to compel must be decided first, because this court's decision on that motion could affect materially the facts relevant to the motion for summary judgment.

Both positions have merit. The defendants are not entirely correct when they argue that a grant of summary judgment completely decides this case; after all, defendant Doe, not a party to the summary judgment motion, would remain a defendant. Still, the motion to compel would of necessity be treated differently if the reporter were not a party to the suit. In addition, removing the named defendants from this action, as will be discussed below, reopens questions about whether it is appropriate for unknown individuals to be parties to an action.

The plaintiffs' point is also well taken. Officer Doe's deposition would contain information directly relevant to this motion. Doe could testify about the events surrounding his or her transmission of the police investigative report to Mutchler, and about police department policy on the availability of confidential police investigative reports. If this court were to grant the motion to compel, the record on summary judgment would be altered greatly (assuming that Mutchler ultimately complied with this court's order and that Doe proved helpful).

■ I am guided by Court of Appeals precedents on Federal Rule of Civil Procedure 56(f), and by the general principles concerning summary judgment. Rule 56(f) is properly invoked in response to a summary judgment motion when the non-movant requires more discovery before it can answer the motion. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Dowling v. City of Philadelphia,* 855 F.2d 136, 139 (3d Cir.1988). Rule 56(f) motions must be accompanied by an affidavit outlining the discovery to be conducted and the information to be sought. *Radich v. Goode,* 886 F.2d 1391, 1393 (3d Cir.1989); *Costlow v. United States,* 552 F.2d 560, 562 (3d Cir.1977). When they are properly made, these motions are granted almost as a matter of course. *See, e.g., International Raw Materials, Ltd. v. Stauffer Chem. Co.,* 898 F.2d 946, 949 (3d Cir.1990); *Costlow,* 552 F.2d at 564.

■ The plaintiffs did not file a Rule 56(f) motion, and no affidavit of record summarizes the discovery to be undertaken. However, the Court of Appeals has observed that, at times, a motion to compel is enough to alert the court to the need to stay its hand until the discovery is complete. *Radich,* 886 F.2d at 1394; *Dowling,* 855 F.2d at 140; *Sames v. Gable,* 732 F.2d 49, 52 (3d Cir.1984). Although a motion to compel has been filed, this does not end the discussion. This court agrees that it cannot resolve a summary judgment motion insofar as it rests upon facts that the dis-

---

**3.** The motion for judgment on the pleadings was denied in an order dated July 2, 1990.

covery that the plaintiffs seek might call into question. After all, Rule 56(c) allows a court to grant summary judgment only if "there is no genuine issue as to any material fact." However, what if the summary judgment motion is, in truth, partly a motion to dismiss, in that it rests in part upon wholly legal arguments? In such a case, provided that the issues are fully briefed, as they have been here, the court would be fully justified in deciding them even in the face of a motion to compel. Furthermore, there may be mixed issues of fact and law in which the facts are not in dispute, and for which the requested discovery would shed no light. Here, too, a court would be justified in forging ahead.[4]

Therefore, this court shall tread an intermediate path. I shall consider the summary judgment motion, but I shall assume that all facts that the sought-after discovery might reasonably produce would be entirely favorable for the plaintiff. In doing this, then, this court converts the summary judgment motion into a motion to dismiss for all matters over which discovery might be expected to prove fruitful.[5] As a practical matter, this approach will not allow examination of the circumstances leading to Mutchler's receipt of the information, save as a purely legal issue. This approach also saves this court a potentially troublesome foray into the thicket of reportorial privilege, because the motion to compel would have this court order a reporter to divulge the identity of her confidential source.

As the plaintiffs have brought the federal counts of this action under 42 U.S.C. § 1983, they must establish "(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981); *Robb v. City of Philadelphia*, 733 F.2d 286, 290–91 (3d Cir.1984). The defendants challenge both prongs. In addition, they argue that the Press Clause of the First Amendment immunizes them from suit. Should the defendants be correct on any of these points, this court would be obliged to enter summary judgment in their favor on the federal counts. Moreover, because the state counts are before this court on pendent jurisdiction, they would be dismissed without prejudice were the federal count to drop out. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 195–96 (3d Cir.1976). The defendants' arguments shall be addressed in turn.

## A. Under Color of State Law?

■ The media defendants maintain that the Scheetzes have failed to demonstrate state action, because the named defendants are private actors and because they have not been shown to have entered into an actionable conspiracy with any state actor. They are correct on the first point. There are no allegations that either Morning Call or Mutchler have been clothed with official power, and private actors are not, without more, subject to suit under 42 U.S.C. § 1983. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–42, 102 S.Ct. 2744, 2755–56,

---

**4.** This court does *not* advocate resolving issues after a Rule 56(f) motion has been filed. If the non-movant has used a Rule 56(f) motion to delay a court's decision, and thus has not responded to the summary judgment motion, the court cannot decide the summary judgment motion. However, where, as here, the non-movant has responded fully to the summary judgment motion, and has *not* filed a Rule 56(f) motion, the court may decide the summary judgment motion, if it does not resolve the motion upon a factual ground over which discovery has been sought.

**5.** Given this result, these caveats are largely unnecessary; the decision against the plaintiffs is essentially legal and hence does not depend upon statements of fact potentially controverted by proposed discovery. The facts relied upon are either within judicial notice or are not controverted.

Moreover, the plaintiff's recommendation would not aid its position materially. If I were to decide the motion to compel first, I would have to decide that the underlying claims were legally adequate before I could grant the motion. Hence, I would still have to reach the legal merits of the complaint.

73 L.Ed.2d 482 (1982); *Melo v. Hafer*, 912 F.2d 628, 638–39 (3d Cir.1990); *see also Wellman v. Williamson Daily News, Inc.*, 582 F.Supp. 1526, 1527–28 (S.D.W. Va.1984) (newspaper not a state actor); *Smith v. Butler*, 507 F.Supp. 952, 954 (E.D.Pa.1981) (Luongo, J.) (same). Were this all, the media defendants would prevail.

■ However, the plaintiffs claim that Morning Call and Mutchler conspired with Officer Doe to violate their constitutional rights. Private persons acting in a conspiracy with state officials act under color of state law, provided that the officials take part in the conspiracy in a manner stemming from their state functions. *Dennis v. Sparks*, 449 U.S. 24, 27–28, 101 S.Ct. 183, 186–87, 66 L.Ed.2d 185 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–52, 90 S.Ct. 1598, 1604–06, 26 L.Ed.2d 142 (1970); *Melo*, 912 F.2d at 637–38; *Labov v. Lalley*, 809 F.2d 220, 222–23 (3d Cir.1987). The defendants, however, attack the application of this general principle on two grounds.

■ First, they maintain that there could be no conspiracy to publish the stories, because, on the evidence before the court, the editors of the newspaper learned of this story, and the existence of the information supplied by Doe to Mutchler, only after the transfer had occurred. Because Mutchler, as a reporter, did not have the authority to publish a story, and because there was no contact between Doe and the editors who had that authority, the defendants argue that there was no conspiracy. Corporations, except insofar as they can act only through their officers, cannot be liable under § 1983 through *respondeat superior*. *See, e.g., Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir.1982); *Draeger v. Grand Central, Inc.*, 504 F.2d 142, 145–46 (10th Cir.1974); *Scutieri v. Estate of Revitz*, 683 F.Supp. 795, 800 (S.D. Fla.1988). Also, all the evidence before this court supports the defendants' assertion that Mutchler lacked the authority to approve a story for publication. *See, e.g.*, Erdman Affidavit at ¶ 4.

■ However, this argument ultimately founders. It cannot be contended that Doe gave the information to Mutchler purely for Mutchler's private delectation. Likewise, Mutchler surely would not have sought the information so assiduously had she not expected to prepare a publishable story. Those involved in this alleged conspiracy acted with a common goal—namely, to have a story published. To argue that this does not amount to a conspiracy because the employee of the newspaper who acted with Doe did not have the power to order that a story be printed is to urge an overly cramped view of the law of conspiracy. Were this argument to prevail, a large organization could avoid conspiracy charges simply through a division of labor. Neither is an explicit agreement among the alleged conspirators required; it is established that "an express agreement among the conspirators is not a necessary element of a civil conspiracy." *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir.1979). It is enough that the conspirators share a general conspiratorial objective, which is facially obvious here. *See Bergman v. Stein*, 404 F.Supp. 287, 296 (S.D.N.Y.1975) (conspiracy between newspaper and state actor recognized in § 1983 action).

Second, the defendants argue that a conspiracy to violate privacy rights requires a showing of the specific intent to violate the rights, and that there is no such evidence here. This, too, is wrong. Whether Doe, Mutchler, or the editors of *The Morning Call* intended to violate the Scheetzes' privacy rights is irrelevant; the question is whether they intended to perform the acts that caused the alleged violation of the Scheetzes' privacy rights. *See, e.g., Hampton*, 600 F.2d at 621. Whatever Doe's motives may have been, he or she presumably released the report in order to have it published; there is no evidence that Doe had any contrary intent, and any other inference would be highly questionable. In this posture, this court cannot say, especially in light of the possibility that Doe would provide evidence supporting the allegations of a conspiracy, that no conspiracy exists.[6]

---

6. *Dowd v. Calabrese*, 589 F.Supp. 1206 (D.D.C. 1984), cited by the defendants, is inapposite.

As a result, this court concludes that the motion for summary judgment cannot be granted on this ground.

Whether state action is present is a different, and unanswered, question. In a similar case, the Court of Appeals for the Tenth Circuit found it necessary to remand to the trial court for detailed findings of fact regarding a possible conspiracy between state actors and journalists. *Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262, 1270–71 (10th Cir.1989). At this point, given the liberal scope required by this procedural posture, this court shall not grant summary judgment for the defendants.

### B. Deprived of What?

■ The defendants' argument that the plaintiffs have been deprived of no federally-recognized right may be dealt with fairly briefly. In *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), a unanimous Court held that "[t]he cases sometimes characterized as protecting 'privacy' have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." 429 U.S. at 598–600, 97 S.Ct. at 876 (footnotes omitted). The former is of interest here. The information here is information that Mrs. Scheetz entrusted to the government, information pertaining to a highly personal episode. In *Whalen* itself, the Court dealt with a New York regulation that required all physicians to forward prescribing information for dangerous drugs to the State Health Department in order that the trade in these drugs might be regulated effectively. A group including patients whose names were on some of these prescriptions sued, claiming that the release of this private information violated their right to privacy. Although the Court ultimately found the statute acceptable, it recognized that a constitutionally protected privacy right existed in those records, both when they were in the possession of their physicians and when they were in the possession of the state. 429 U.S. at 600, 97 S.Ct. at 876–77. Thus, the Court has recognized that information held by the state may carry with it constitutional privacy protections.

Although the Court has not dealt with a case like this, other courts have. Our Court of Appeals did so in *Trade Waste Management Ass'n, Inc. v. Hughey*, 780 F.2d 221 (3d Cir.1985), in which a New Jersey statute requiring that those who wished to operate waste dumps divulge health and criminal justice information to the state was upheld; the court found that there was a protectible privacy interest in the information requested. 780 F.2d at 234. Likewise, in *Fraternal Order of Police v. City of Philadelphia*, 812 F.2d 105 (3d Cir.1987), the Court of Appeals upheld Police Department regulations that required applicants for a special investigative unit to release extensive medical, financial, and behavioral information to the Department. There, too, the court found that this information was protected by the Constitution. 812 F.2d at 109–10. *Accord In re Search Warrant (Sealed)*, 810 F.2d 67, 71 (3d Cir.1987). Many other courts have found that those with personal information in the control of the state retain constitutional protection against its inappropriate disclosure. *See, e.g., Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir.1990) (Ervin, C.J.) (family, financial, medical, and sexual information); *Slayton v. Willingham*, 726 F.2d 631, 635 (10th Cir.1984) (per curiam) (personal photographs); *Plante v. Gonzalez*, 575 F.2d 1119, 1132 (5th Cir. 1978) (Wisdom, J.) (financial information); *Woods v. White*, 689 F.Supp. 874, 875–76 (W.D.Wis.1988) (health information); *B.J. R.L. v. Utah*, 655 F.Supp. 692, 699 (D.Utah

There the court granted summary judgment on a count alleging conspiracy to defame, holding that specific intent to defame is required to establish a conspiracy to defame. 589 F.Supp. at 1214. First, the hybrid posture of this case makes it impossible to say that Doe would not produce evidence that would support even an extremely narrow view of conspiracy. Second, the *Dowd* court relied in part on the very wide latitude given media defendants in defamation actions. Where, as here, the primary claim is for a violation of civil rights, the strict *Dowd* rule is unduly weighted toward the defendants.

1987) (paternity information); *Natwig v. Webster,* 562 F.Supp. 225, 226–27 & n. 1 (D.R.I.1983) (arrest records not leading to conviction). In light of this mass of authority, this court concludes that *Whalen* and its progeny recognize a constitutional right to privacy that encompasses information contained on police investigative reports.[7]

The defendants rely upon *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), to support their assertion that there is no protectible privacy interest here. In *Paul,* the plaintiff sued a chief of police under 42 U.S.C. § 1983 for circulating fliers that falsely listed him as a shoplifter; in fact, he had been arrested for shoplifting, but the charges had been dismissed. 424 U.S. at 695–96, 96 S.Ct. at 1157–58. The plaintiff argued that the fliers defamed him and violated his rights to privacy. The Court held that his complaint, though perhaps alleging a state-law tort, did not amount to a cognizable § 1983 claim. For the most part, the opinion dealt with the proposition that state-law claims are not actionable under § 1983. 424 U.S. at 697–712, 96 S.Ct. at 1159–66. The privacy claims were disposed of because the right to privacy was limited to "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education," none of which were involved. 424 U.S. at 713, 96 S.Ct. at 1166.

The primary aspect of *Paul* is irrelevant to this case; although the plaintiffs assert state-law claims, they do so separately from the § 1983 counts. The secondary argument in *Paul,* though seemingly harmful to the Scheetzes, was modified by the unanimous opinion in *Whalen* just one year later. *Paul* is thus no longer reliable authority on the scope of the privacy right, and the cases referred to above, which explicitly follow *Whalen,* make that clear. This court, as it must, follows *Whalen* and the Court of Appeals cases in holding that the Scheetzes possess a right to privacy that may serve as the basis for a § 1983 claim.[8]

## C. The Press's Privilege

Finally, Morning Call and Mutchler argue that, even if the formal requisites of a § 1983 action are present, the press's First Amendment rights bar the Scheetzes' privacy claim. First, they maintain that the Press Clause absolutely bars civil liability for the publication of truthful information. Second, they argue that, even if it is constitutional to punish the publication of truthful information unlawfully obtained, they obtained the information lawfully and thus may assert an absolute privilege. Third, they argue that, whatever the result of the first two questions, the interests advanced by the Press Clause outweigh those that the Scheetzes' have in the constitutional right to privacy, and thus that their actions are privileged. I shall consider these in turn.

### 1. The Absolute Privilege

■ The media defendants insist that there is an absolute privilege to publish truthful information, however it is obtained. The plaintiffs concede that there may be no civil penalties when a newspaper publishes truthful information that it has obtained lawfully, but conclude that there may be civil sanctions when the press publishes information unlawfully obtained.

There is, indeed, an absolute privilege to publish truthful information lawfully obtained. In *Cox Broadcasting, Inc. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), the Court held that a Georgia statute making it a misdemeanor to publish or broadcast the name of a rape victim violated the First Amendment. The

---

7. I address the waiver of privacy and the weight that the privacy right merits below.

8. Many of the other cases referred to by the defendants antedate *Whalen,* and are thus no longer reliable authority on the scope of the privacy right. *See, e.g., Hall v. Pennsylvania State Police,* 433 F.Supp. 385 (E.D.Pa.1976); *Mimms v. Philadelphia Newspapers, Inc.,* 352 F.Supp. 862 (E.D.Pa.1972); *Travers v. Paton,* 261 F.Supp. 110 (D.Conn.1966). This court rejects those cases after *Whalen* that continue to look to *Paul. See, e.g., Wade v. Goodwin,* 843 F.2d 1150, 1153 (8th Cir.1988); *J.P. v. DeSanti,* 653 F.2d 1080, 1088–89 (6th Cir.1981); *Jones v. Palmer Media, Inc.,* 478 F.Supp. 1124, 1130 (E.D. Tex.1979).

Court concluded that the common-law right to privacy, though "plainly rooted in the traditions and significant concerns of our society," faded when the information for which privacy rights were asserted was a matter of public record. 420 U.S. at 491, 492–96, 95 S.Ct. at 1044–47.[9]

More recently, *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979), dealt with a West Virginia statute making it a crime to publish, without court approval, the names of those charged with juvenile offenses. The newspaper indicted under this statute had procured the information by monitoring the police radio frequency and dispatching reporters, who interviewed those present, to the scene of the incident. 443 U.S. at 99, 99 S.Ct. at 2668–69. Here, too, the Court found it significant that the information was lawfully obtained, using routine newspaper reporting techniques, and that the matter was of public significance. 443 U.S. at 103, 99 S.Ct. at 2670–71. The State's interest in protecting juveniles was, the Court held, overpowered by the rights created by the First Amendment. 443 U.S. at 104, 99 S.Ct. at 2671.

Finally, and most recently, *Florida Star v. B.J.F.*, — U.S. —, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989), stated that a Florida statute rendering unlawful the publication of the names of sexual offense victims was unconstitutional. The newspaper there had procured the information from a police report made available by the police department. 109 S.Ct. at 2605–06. The Court, following *Daily Mail*, reaffirmed that the publication of truthful information lawfully obtained could be punished only to further the most compelling of state interests. 109 S.Ct. at 2609. In so doing, the Court expressly declined to rule that truthful publication may never be punished. 109 S.Ct. at 2608. More particularly, the Court stated

that "[t]he *Daily Mail* principle does not settle the issue of whether, in cases where information has been acquired *unlawfully* by a newspaper or by a source, government may ever punish not only the unlawful acquisition, but the ensuing publication as well." 109 S.Ct. at 2610 n. 8.[10] Thus, it remains open whether *The Morning Call* can be sued under 42 U.S.C. § 1983 for the invasion of the Scheetzes' constitutional right of privacy where the information published was unlawfully obtained.

This court concludes that the newspaper can. First, a close reading of the cases referred to in footnote eight of *Florida Star* leads this court to believe that the Court has suggested that civil penalties may, at times, be appropriate. In *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam), the Court held, by a vote of six to three, that the New York Times and the Washington Post could not be enjoined from publishing the Pentagon Papers. Prior restraint is, however, a more severe restriction than post-publication civil liability.[11] The *seriatim* opinions of the justices are more instructive. Justices Black, Douglas, and Brennan held, either explicitly or implicitly, that post-publication restraints would be unacceptable. 403 U.S. at 714–20, 91 S.Ct. at 2141–45 (Black, J., concurring); 403 U.S. at 720–24, 91 S.Ct. at 2144–45 (Douglas, J., concurring); 403 U.S. at 726–27, 91 S.Ct. at 2147–48 (Brennan, J., concurring).

In contrast, Justice White, joined by Justice Stewart, found that newspapers could face criminal sanctions for publishing confidential information and that he "would have no difficulty in sustaining convictions ... on facts that would not justify ... imposition of a prior restraint." 403 U.S. at 735–37, 91 S.Ct. at 2152–53 (White, J.,

---

**9.** The Court explicitly chose not to decide "whether truthful publications may ever be subjected to civil or criminal liability consistently with the First or Fourteenth Amendments...." *Cox*, 420 U.S. at 491, 95 S.Ct. at 1044.

**10.** It went on to state that "[t]his issue was raised but not definitively resolved in *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), and reserved in

*Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 837 [98 S.Ct. 1535, 1540–41, 56 L.Ed.2d 1] (1978)." 109 S.Ct. at 2610 n. 8.

**11.** Sufficiently severe civil liability may, however, have so great a chilling effect upon publication that it has the same effect as a prior restraint. But that is not yet at issue.

concurring). Justice Marshall, in concurrence, and Chief Justice Burger and Justice Blackmun, in dissent, expressly agreed with Justice White's statement. 403 U.S. at 745, 91 S.Ct. at 2157 (Marshall, J., concurring); 403 U.S. at 752, 91 S.Ct. at 2160–61 (Burger, C.J., dissenting); 403 U.S. at 759, 91 S.Ct. at 2164 (Blackmun, J., dissenting). Justice Harlan, though dissenting, did not address the issue. Thus, at least five justices stated, admittedly as dictum, that penal statutes would be permissible.[12]

*Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), is the other case mentioned in the *Florida Star* footnote. In *Landmark,* the Court was faced with a Virginia statute which imposed criminal sanctions for divulging information regarding proceedings before the Virginia Judicial Inquiry and Review Commission. The Court, balancing the First Amendment interests of the media against the deleterious effects disclosure would have on the operation of the Commission, held that this statute was unconstitutional. 435 U.S. at 840–42, 98 S.Ct. at 1542–43. However, when it did so, it stated that "[w]e are not here concerned with the possible applicability of the statute to one who secures the information by illegal means and thereafter divulges it." 435 U.S. at 837, 98 S.Ct. at 1540. Moreover, the Court declined to take the categorical position that truthful reporting about public affairs is always insulated from criminal liability—a position that, even if taken, would not reach the *civil* liability at issue here. 435 U.S. at 838, 98 S.Ct. at 1541. Thus, as the *Florida Star* Court observed, *Landmark* reserves the issue that faces this court.

It is true, as the defendants point out, that no Court opinion has upheld a statute restraining the press.[13] However, the Court has not yet faced this question squarely. What this court can glean from *New York Times Co. v. United States* leads it to believe that the Court would probably have upheld a statute making illegal the publication of information unlawfully obtained. In addition, it should be noted that the Court's opinions on the publication of truthful information *lawfully* obtained have, in the main, dealt with non-constitutional interests. These cases thus provide some support for this court's conclusion.

An analogous line of authority is more helpful. The Court has often observed that newspapers are not immune from laws of general application. *See, e.g., Branzburg v. Hayes,* 408 U.S. 665, 683, 92 S.Ct. 2646, 2657–58, 33 L.Ed.2d 626 (1972) (subpoenas for grand juries); *Citizen Publishing Co. v. United States,* 394 U.S. 131, 139, 89 S.Ct. 927, 931–32, 22 L.Ed.2d 148 (1969) (Sherman Act); *Breard v. Alexandria,* 341 U.S. 622, 641, 71 S.Ct. 920, 932, 95 L.Ed. 1233 (1951) (prohibition of door-to-door solicitation); *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 192–93, 66 S.Ct. 494, 497–98, 90 L.Ed. 614 (1946) (FLSA); *Associated Press v. NLRB,* 301 U.S. 103, 132–33, 57 S.Ct. 650, 655–56, 81 L.Ed. 953 (1937) (NLRA); *Grosjean v. American Press Co.,* 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936) (taxation).[14] The law in question here, 42 U.S.C. § 1983, is assuredly not directed against newspapers. It is a powerful weapon for any who find their rights trampled by the state, or by those who connive with it. Indeed, as suggested above, it is the rare case in which a newspaper will find itself a

---

**12.** This court hastens to note that this reading in no way amounts to a finding of binding precedent. However, the *Florida Star* Court, as noted above, specifically mentioned that the issue before this court had been "raised but not definitively resolved" in *New York Times v. United States. Florida Star,* 109 S.Ct. at 2610 n. 8. Hence, this exegesis is appropriate as a means of determining, to the extent that the issue *was* resolved there, just what light *New York Times* could shed on it.

**13.** Though, until recently, this would also have been said about defamation. *See Milkovich v. Lorain Journal Co.,* — U.S. ——, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

**14.** The lower courts have followed suit. For example, in *Dietemann v. Time, Inc.,* 449 F.2d 245 (9th Cir.1971), the court, through Judge Hufstedler, observed that "[t]he First Amendment has never been construed to accord newsmen immunity from torts or crimes committed during the course of newsgathering." 449 F.2d at 249.

defendant. However, just as here, there are, from time to time, some who believe that a newspaper has acted with the state to deprive them of rights protected by the Constitution of the United States. *See, e.g., Phelps,* 886 F.2d at 1270.

Finally, there is the line of cases that holds that the newsgathering actions of the press must operate within certain bounds. Journalists undeniably are protected, to some degree, when they seek information; as the Court has observed, "without some protection for seeking out the news, freedom of the press would be eviscerated." *Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972). Accordingly, reporters are entitled to some protection for "routine newspaper reporting techniques." *Daily Mail,* 443 U.S. at 103, 99 S.Ct. at 2671. At the same time, membership in the Newspaper Guild does not grant one a roving commission to violate the laws; as Chief Justice Warren put it, "[t]he right to speak and publish does not carry with it the unrestricted right to gather information." *Zemel v. Rusk,* 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965). Thus, the Ninth Circuit Court of Appeals has allowed the fact of publication to provide an element of damages where journalists gained access to the plaintiff's home by subterfuge and took unauthorized photographs and recordings. *Dietemann v. Time, Inc.,* 449 F.2d 245, 249–50 (9th Cir.1971) (Hufstedler, J.). Likewise, the Second Circuit Court of Appeals found warranted a strict injunction placed on a photographer who, in the course of attempting to secure photographs of Jacqueline Kennedy Onassis and

her children, harassed, abused, and endangered them. *Galella v. Onassis,* 487 F.2d 986 (2d Cir.1973). Even *Branzburg* made clear that journalists could not avoid grand jury testimony in an effort to retain the confidentiality of sources.[15] Here, again, the rights of the press to gather news are circumscribed by the rights possessed by others and the obligations due others.

Though the deference owed the press is great, it is one thing to say that it is very hard for the press's rights to be overcome by countervailing considerations, and quite another to say that these rights may *never* be overcome. It would be peculiar to create *absolute* immunity for improper actions, though perhaps done to advance a noble aim. Accordingly, this court holds that the press's right to publish truthful information unlawfully obtained is *not* absolute. It cannot grant summary judgment for the defendants on this ground.

### 2. Lawfully Obtained?

■ In order to avoid the *Cox Broadcasting–Daily Mail–Florida Star* rule, the plaintiffs must be able to show that the newspaper acted unlawfully. The defendants maintain that Mutchler's actions did not proceed beyond routine newsgathering, and that, in any event, nothing she did could amount to a crime. The plaintiffs have suggested that Mutchler either stole the report or had it stolen for her, making her either a receiver of stolen goods or an accessory to a theft.[16]

The evidence before this court suggests otherwise. Mutchler's affidavit states that, after she was denied access to the

---

**15.** Those who supply information to the press can be criminally prosecuted. *See, e.g., United States v. Wallington,* 889 F.2d 573, 576–79 (5th Cir.1989) (federal statute prohibiting release of confidential information upheld over First Amendment challenge); *United States v. Morison,* 844 F.2d 1057, 1068–70 (4th Cir.1988) (Espionage Act conviction of former government employee who supplied classified material to periodical).

There is a distinction between punishing an individual who breaks the law in order that a story may be published and punishing the publisher who prints the story, knowing the infor-

mation to have been obtained unlawfully. There is also a distinction in the criminal law between thieves and receivers of stolen goods, but both are criminals. This court does not mean to say that the media are liable to the same degree as those who act improperly for it, or those who supply it with improperly-obtained material. But the distinctions are of degree, not of kind.

**16.** Although this contention does not appear in the briefs, it was made during oral argument. Transcript, 6/25/90 at 29–30.

investigative report,[17] she contacted various sources in an effort to determine whether one of them had a copy. Mutchler Affidavit at ¶ 9. One of these sources thereafter showed her a copy of the original report, which she copied by hand. Affidavit at ¶¶ 11–12. She also states that she never had the report and other, related material in her possession, save when she copied the information. Affidavit at ¶ 13. Finally, she states that she never encouraged anyone, much less her source, to steal the report from the police file room. Affidavit at ¶¶ 10, 21.

The Pennsylvania theft statute provides that "[a] person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa.Cons.Stat.Ann. § 3921 (Purdon 1983). One is guilty of receiving stolen property, a variety of theft, if "he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen ..." 18 Pa.Cons.Stat.Ann. § 3925 (Purdon 1983). Assuming that Mutchler's affidavit is entirely correct, it may still be true that Doe committed theft. The theft would not be of the report proper, though, but of the sheets of paper that carried the information. From various depositions, it is clear that the original investigative report was under close control, and thus almost certainly did not leave the building. See, e.g., Koons Dep. at 21–24, 36–37; Houck Dep. at 66–69; Bosha Dep. at 21–23, 34–35. Thus, any copy of it would have to have been made on an Allentown Police Department photocopier, using City of Allentown paper. If the copy was made with the intent to abstract it, then there was a (petty) theft.

If Mutchler's affidavit is accurate, though, she would not be a receiver of those stolen goods, because she states that she merely copied down the information. However, there are at least three ways in which Mutchler could have performed an illegal act. First, she might be uncandid in her affidavit.[18] If so, she may have received a copy of the report from Doe, thus perhaps making her a receiver of stolen goods (or, for that matter, she might have helped organize a theft).[19] Second, she might have committed the tort of conversion if she possessed a copy of the report, however briefly. Baram v. Farugia, 606 F.2d 42, 43 (3d Cir.1979); Stevenson v. Economy Bank of Ambridge, 413 Pa. 442, 451, 197 A.2d 721, 725 (1964). Third, she might have stolen confidential information, just as one may steal a trade secret. Pennsylvania defines property, for the purposes of the theft statute, as "[a]nything of value, including ... intangible personal property...." 18 Pa.Cons.Stat.Ann. § 3901 (Purdon 1983).

Ultimately, this court need decide none of these issues. Although Mutchler is one of the parties to the exchange, the other—Doe—has not been heard from. What he or she might say is unknown. Because Doe could, if this court granted the motion to compel, provide potentially dispositive information on this area, this court cannot grant summary judgment while the motion to compel is outstanding.

### 3. Constitutional Balancing

Finally, the media defendants argue that their actions are protected because, in this context, the First Amendment rights that they assert outweigh the constitutional privacy rights of the Scheetzes. The plaintiffs contend that what First Amendment rights Morning Call and Mutchler have are dwarfed by their privacy rights. This balancing is difficult.

17. An investigative report consists of all material gathered by the investigating officers. This distinguishes it from the incident report ("face sheet"), which is the form that contains the offense, location, name and address of the complainant, and date and time of the report. See, e.g., Mutchler Affidavit, Exh. B (face sheet and investigative report).

18. This court hastens to add that it has no reason, on the information before it, to believe that she is lying; rather, it merely holds open the possibility.

19. Of course, Doe might have had a legitimately-obtained copy of the report, which he copied at his own expense. With Doe's deposition untaken, this court cannot tell what happened.

However, this court concludes that the Press Clause rights of the media defendants must prevail, and, thus, that summary judgment should be granted for Morning Call and Mutchler.

Before this court can balance these rights, it notes that balancing is legitimate. Time and again, the Court, though reasserting that the rights protected by the First Amendment are fundamental, has made clear that any restriction on speech—even a prior restraint—may be permissible if sufficiently compelling reasons warrant it. *See, e.g., Near v. Minnesota,* 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931) (prior restraint justifiable); *see also, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983) (content-based restrictions justifiable); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976) (time, place, and manner restrictions justifiable). Thus, the press may not use the First Amendment to trump any and all privacy claims brought against it. Neither, however, may the Scheetzes do no more than assert a constitutional privacy right. As *Whalen* makes clear, the interests protected by the constitutional right to privacy may be outweighed by significant non-constitutional state interests. *Whalen,* 429 U.S. at 600–04, 97 S.Ct. at 876–79; *see also, e.g., United States v. Westinghouse Elec. Corp.,* 638 F.2d 570, 577–78 (3d Cir. 1980). Here, too, the privacy right creates no absolute claim to protection.

The cases that have weighed these rights have done so when balancing the interests of the state in advancing a policy or a statute against the rights, whether in speech or privacy, of the individual. However, the general approach presented in these cases applies here as well. *See, e.g., Tavoulareas v. Washington Post Co.,* 724 F.2d 1010, 1022–23 (D.C.Cir.1984) (balancing press and privacy rights). As Professor Chafee put it, "there are individual interests and social interests, which must be balanced against each other, if they conflict, in order to determine which interest shall be sacrificed and which shall be protected. . . ." Z. Chafee, *Free Speech in the United States* 32 (1954).[20] This court will thus evaluate the competing claims of rights.

### a. First Amendment

The general principles here are well-established. As the Court has observed, "[f]reedom of press, freedom of speech, freedom of religion are in a preferred position." *Murdock v. Pennsylvania,* 319 U.S. 105, 115, 63 S.Ct. 870, 876, 87 L.Ed. 1292 (1943). The Court has "recognized that the First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open,' and [has] consistently commented on the central importance of protecting speech on public issues." *Boos v. Barry,* 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720–21, 11 L.Ed.2d 686 (1964)) (citations omitted). Though expression of any type has a significant measure of constitutional protection, speech about the conduct of government is especially cherished; as the Court

**20.** The media defendants maintain that the proper analysis would have this court treat the Scheetzes' claim as though it was a libel action; this would require that the plaintiffs, though the non-movants, set forth clear and convincing evidence to support all elements of the claim. *New York Times Co. v. Sullivan,* 376 U.S. 254, 285–86, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964). However, this test is relevant only where the competing considerations are the constitutional rights of the press, on one hand, and the non-constitutional rights of the allegedly defamed individual, on the other. Because the issue framed in this case presents significant constitutional issues on each side, so strict a test is unwarranted. The defendants are also wrong when they argue that the plaintiffs have had a "full opportunity to conduct discovery." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The incomplete depositions of Mutchler and Erdman, and the absence of Doe, create significant holes in the discovery that would have to be filled before the defendants' proposal could be effected. Although the rights in conflict do not stand on an equal footing, as the discussion below shows, they are similar in kind, if not in extent, and so an orthodox balancing test is best suited to this analysis.

has phrased it, "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964).

These declarations are reinforced when the Press Clause, rather than just the Speech Clause, is at issue. As Justice Stewart has observed, "[t]he publishing business is ... the only organized private business that is given explicit constitutional protection." Stewart, *"Or of the Press"*, 26 Hastings L.J. 631, 633 (1975). The Framers gave the press explicit protection as it bathed government in the harsh glare of publicity. Thus, for example, in the *Cox Broadcasting–Daily Mail–Florida Star* line of cases, state interests in limiting the spread of information were set aside in favor of the rights of a free press.

The scrutiny given state attempts to regulate the content of speech is thus severe; "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982)). The test, similar to the strict scrutiny test in equal protection analysis, requires that the state "must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

The stories at issue here are precisely of the type that the courts have most strongly defended. The first story calls into question the wisdom of the Allentown Police Department, both in failing to investigate internally Mr. Scheetz's assault upon Mrs. Scheetz and in honoring him as officer of the year. A plurality of its space is given to statements by Chief Stephens about why Scheetz received the award (including the assertion that the assault played no factor in the decision), whether the information obtained about Scheetz was stolen, and how women sometimes "tear their dresses and rip their bras and say they were raped." App. A. Other space is given to tributes to Scheetz and discussions about the legality of withholding investigative reports. Less than one-quarter of the article set out the contents of the investigative report.

The second story was again dominated by quotes from Chief Stephens, who sought to correct "misunderstandings" created by the first story. App. B. He explained that, though he had not investigated the Scheetz assault himself, others in the department had. He also attempted to address the concerns expressed by some callers that he, and his department, attached little importance to complaints of domestic violence. Facts drawn from the investigative report again occupied a relatively small portion of the article.

Thus, the articles' main focus is the Allentown Police Department, not Officer Scheetz. The bulk of each story was comment from the Chief of Police about both the Scheetz matter and related issues. Although the pieces are stories, not editorials, it is clear that the intent was not to titillate readers with eighteen-month-old gossip, or even, as the plaintiffs' counsel put it, to take a "cheap shot" at the Scheetzes when they were particularly successful.[21] Plaintiffs' Brief Contra Defendants' Motion for Summary Judgment at 25. Rather, the article is about questionable actions by the Allentown Police Department. It is hence especially resistant to attack; as the Court recently observed, "the publication of information relating to alleged governmental misconduct [is] speech which has traditionally been recognized as lying at the core of the First Amendment." *Butterworth v. Smith*, —— U.S. ——, 110 S.Ct. 1376, 1381, 108 L.Ed.2d 572 (1990); *see also Cox Broadcasting*, 420 U.S. at 495, 95 S.Ct. at 1046 ("[t]he freedom of the press to publish [public records] appears to us to be of

---

**21.** Whether this may have been the intent behind Doe's release of the information is irrelevant.

critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business.").

An editorial could, in general terms, attack Chief Stephens or the Police Department for misconduct (though, since *Milkovich,* this might prove perilous). But its effect would be minimal with no concrete examples. Though the reporting inevitably discussed Mrs. Scheetz's assault in some detail, it is precisely this detail that lends credence to the broader scope of the stories. In *Gilbert v. Medical Economics Co.,* 665 F.2d 305 (10th Cir.1981), the plaintiff, a physician whose competence was harshly criticized in an article about the failure of hospital self-policing, sued the publisher for tortious invasion of privacy. In particular, the plaintiff objected to the use of her name, photograph, and psychiatric and marital history. The court, in holding for the defendant, observed that:

> [T]hese truthful representations are substantially relevant to a newsworthy topic because they strengthen the impact and credibility of the article. They obviate any impression that the problems raised in the article are remote or hypothetical, thus providing an aura of immediacy.... While it is true that [the psychiatric and marital information] would fall outside the first amendment privilege in the absence of either independent newsworthiness or any substantial nexus with a newsworthy topic, here they are connected to the newsworthy topic by the rational inference that plaintiff's personal problems were the underlying cause of the acts of alleged malpractice.

665 F.2d at 308–09. As in *Gilbert,* even the information about psychological therapy was relevant to the tenor of the piece. Mr. Scheetz's earlier refusal to seek therapy makes all the more troublesome any failure by the Police Department to investigate him, as well as its decision to make him Officer of the Year. Publicizing the Scheetzes' later decision to seek therapy may have been an attempt to provide balance. In its context, the fact also serves to criticize Chief Stephens, who is quoted immediately after as saying that, once Officer Scheetz told him that the couple had made an appointment for counseling, he saw no reason to inquire further. App. A.

In sum, this court finds that the type of First Amendment right asserted here lies at the core of this fundamental source of our liberties, and that the story is, taken as a whole, devoted to advancing this right. The defendants thus have an extremely weighty right to publish the information that they did.

#### b. *Privacy*

The right to privacy, termed by Justice Brandeis "the most comprehensive of rights and the right most valued by civilized man," has two components. *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). The first is "the individual interest in avoiding disclosure of personal matters." *Whalen,* 429 U.S. at 599, 97 S.Ct. at 876; *Walls,* 895 F.2d at 192; *In re Search Warrant (Sealed),* 810 F.2d at 71. The second, more closely related to *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), is "the interest in independence in making certain kinds of important decisions." *Whalen,* 429 U.S. at 599–600, 97 S.Ct. at 876; *see also, e.g., Shields v. Burge,* 874 F.2d 1201, 1209 (7th Cir.1989); *Plowman v. United States Dep't of the Army,* 698 F.Supp. 627, 633 (E.D.Va.1988).

The plaintiffs' claim falls under both headings. The confidentiality right is obvious; significant amounts of information which the plaintiffs believed confidential was suddenly released in a prominent manner. The autonomy right is less direct. The plaintiffs maintain that their marital relations have been injured by the articles and that they have been reluctant to seek further counseling because of their fear that this, too, would be publicized. The former claim is too indirect to warrant protection under this aspect of privacy. The plaintiffs are correct when they argue that their marital relations are shielded by the privacy right, but a great deal of information, much of it only marginally connected with marital relations, may injure a relationship. For example, a story about a spouse's fraudulent enterprises might well

sunder a marriage, yet it would be unreasonable to say that the information was essentially marital. However, the latter is appropriate. Whether to seek medical care, and the information it yields, are assuredly within the autonomy prong of the privacy right. *See, e.g., Whalen*, 429 U.S. at 600, 97 S.Ct. at 876–77; *Fraternal Order of Police*, 812 F.2d at 113; *Westinghouse Elec. Corp.*, 638 F.2d at 577. Indeed, in this respect the Scheetzes' claim very much resembles that in *Whalen*. There the plaintiffs argued that they were entitled to protection of their controlled drug prescription history because release of the information to the state would dissuade some from seeking appropriate medical attention. *Whalen*, 429 U.S. at 600, 97 S.Ct. at 876–77. This argument fits well with the facts here; accordingly, both types of privacy interests are germane.

The courts have differed greatly in the approach to take to assertions of the constitutional right to privacy. *Whalen* gives little assistance, as it stated no explicit test.[22] Some courts have chosen the strict scrutiny test used in content-based First Amendment cases. *See, e.g., Walls*, 895 F.2d at 192; *Flanagan v. Musser*, 890 F.2d 1557, 1570 (10th Cir.1989); *Tavoulareas*, 724 F.2d at 1023. However, our Court of Appeals has adopted a more flexible test. In the main, this employs intermediate scrutiny, with strict scrutiny required for severe intrusions upon confidentiality or releases of especially "intimate or personal" information. *Fraternal Order of Police*, 812 F.2d at 110–12; *see also Trade Waste Management*, 780 F.2d at 234; *Westinghouse Elec. Corp.*, 638 F.2d at 577–78. In the course of this balancing, the broader confidentiality right is, in general, weaker than the more focused autonomy right. *See, e.g., Kneeland v. NCAA*, 650 F.Supp. 1076, 1081 (W.D.Tex.1986).

### i. Confidentiality

Most of the information in question is protected by a privacy claim solely because of the Scheetzes' protectible interest in its confidentiality. Thus, this court must consider whether the Scheetzes had any reasonable expectations that the information in the report would remain private. *Fraternal Order of Police*, 812 F.2d at 112.[23] Making a police report could be called at least a partial waiver of confidentiality. After all, much of the point in filing a complaint is to secure police action that may result in arrest and conviction, and court records are almost without exception public. *See, e.g., Florida Star*, 109 S.Ct. at 2608; *Cox Broadcasting*, 420 U.S. at 492, 95 S.Ct. at 1044–45. Furthermore, Mrs. Scheetz did not, in principle, control whether Mr. Scheetz would be prosecuted; if probable cause is present, the police may make an arrest (though they would seldom do so if the complainant were unwilling to proceed).

■ However, our Court of Appeals has held that that portion of a bill of particulars which contained a list of unindicted co-conspirators could be sealed from press access, because the potential harm to "the privacy and reputational interests of the named individuals" was immense. *United States v. Smith*, 776 F.2d 1104, 1114 (3d Cir.1985). The same logic applies to dropped complaints; a complaint may be baseless and vindictive, but the fact that it has been filed may bring harm to an innocent person. Furthermore, over a year had elapsed from the time that the complaint was filed to the time of the stories. Even if Mrs. Scheetz might have been held to have waived part of her expectation of privacy when she filed the complaint,[24] by the time of the stories she, and her hus-

**22.** It did refer to the legislation that was upheld as a "reasonable exercise of [the state's] broad police powers," which suggests that it employed a fairly low level of scrutiny. 429 U.S. at 598, 97 S.Ct. at 875–76.

**23.** Although the constitutional right to privacy is not defined by state statutes and policies, they "may inform our judgment concerning the scope" of that right. *Flanagan*, 890 F.2d at

1571; *see also, e.g., Westinghouse Elec. Corp.*, 638 F.2d at 578.

**24.** More precisely, she would have made a limited waiver insofar as the information was known by those officers working on the case (not a relevant consideration here), as well as a broader waiver contingent upon prosecution.

band, might justifiably have relied upon the inaction and upon the assurance that no prosecution would result. Reporting the incident to the police thus did not abrogate the expectation of privacy.[25]

 However, other matters related to the events may have diminished the privacy expectations in certain of the facts. First, Mrs. Scheetz reported a disturbance at her home on January 14, 1988—the sum of the information reported on the incident report. Although Chief Stephens denied this report to Mutchler, he appears to have done so improperly. The Pennsylvania courts, construing the Pennsylvania Right-to-Know Act, Pa.Stat.Ann. tit. 65, § 66.1(2) (Purdon Supp.1990), have held that police blotters (which contain essentially the same information as incident reports) are public records within the meaning of the statute and must be made available to the public. *See, e.g., Lebanon News Publishing Co. v. City of Lebanon*, 69 Pa.Commw. 337, 341–42, 451 A.2d 266, 268 (1982); *In re Cambria County Clerk of Courts*, 13 Pa.D. & C.3d 710, 711 (Cambria C.P.1980). Assuming that Mutchler had chosen the orthodox method to secure Right-to-Know Act information from recalcitrant officials—a lawsuit pursuant to Pa.Stat.Ann. tit. 65, § 66.4 (Purdon Supp.1990)—she would surely have received the incident report. In light of this clear public policy, it cannot be said that the Scheetzes had a reasonable expectation of privacy in these facts.

 In contrast, police investigative reports are not considered public records for the purposes of the Right-to-Know Act, and do not have assured public access. *See, e.g., Barton v. Penco*, 292 Pa.Super. 202, 206, 436 A.2d 1222, 1224 (1981); *Sullivan v. City of Pittsburgh*, 561 A.2d 863, 864–65 (Pa.Commw.1989). Whether the Scheetzes would have reasonable expectations of privacy would thus depend upon departmental policy. At the time of the stories, the Allentown Police Department had recently adopted a policy under which incident reports would be made available freely, but supplemental information could be released "only at the discretion of the Shift Commander." Stephens Dep. at Exh. 7. The deponents dispute whether *The Morning Call*, which was consulted when this policy was drafted, assented to it. *Compare* Erdman Dep. at 28–48 (no assent) *with* Stephens Dep. at 120–22 (assent). For these purposes, it is enough to note that *The Morning Call* was aware of the policy. Likewise, there are differences of opinion about how often supplemental reports were released. *Compare* Rendish Dep. at 45–47, 57–58 (virtually never) *with* Mutchler Aff. at ¶ 16 (repeatedly). Because the defendants are the movants, this court must conclude that the reports were almost never released. Thus, the Scheetzes had a reasonable expectation that the investigative report would remain confidential.

That the report might be confidential does not, however, mean that the information on it is confidential, if it was known independently to a significant number of people. A classified document may contain a commonplace fact, but the commonplace fact does not thereby become classified. The last step in this part of the privacy inquiry is to ask to what extent Mutchler might have procured the information without resort to confidential documents; to the extent that she had independent sources for these facts, the privacy right that the plaintiffs seek to assert is diluted. The difficulty for the Scheetzes is the somewhat public atmosphere in which many of the January, 1988 events happened. Though the assault appears to have gone unwitnessed, Mrs. Scheetz spent the night in the police station. There she was seen by a significant number of police officers, who made the facts of the incident fairly common knowledge around the Police Department.[26] *See, e.g.,* Koons Dep. at

---

**25.** It might be added that this is a desirable result, at least in this context, for wholly independent policy reasons. If a woman knew that she had no expectation of privacy, leaving prosecution aside, if she summoned the police after she was abused, she would be more reluctant to summon them.

**26.** An incident of this sort involving the wife of a police officer would attract more attention and comment than the equivalent incident involving an outsider.

27–28, 46–48; Houck Dep. at 58–61. As the investigative report indicated, some of Mrs. Scheetz's injuries were visible. Mutchler Affidavit at Exh. B. In light of this uncontroverted evidence, this court concludes that there was at least general knowledge within the Department about the January incident from its occurrence onward.[27]

To summarize, the Scheetzes would not have a reasonable expectation of privacy in the fact that an incident occurred, though they would in the supplemental reports as such. The general situation seems to have become widely known within the Police Department when the assault occurred, and some of the events and facts were probably witnessed by a significant number of people. These facts yield a somewhat attenuated expectation of privacy as to the broad outlines of the January incident, with greater protection for the details.

### ii. Autonomy

■■ The facts here are those about psychological counseling; first, that Mr. Scheetz had refused to see a counselor, in spite of his wife's request, and, second, that the Scheetzes had arranged to see a psychologist. This court need not repeat the discussion above, which does little to suggest that this privacy interest might have been weakened by free disclosure. Whether the Scheetzes had sought counseling would not be physically obvious, and there is no evidence that she told anyone of this except the officers who responded to her call. As the Court of Appeals has observed, information about one's behavior and medical treatment should receive strong privacy protection. *Fraternal Order of Police*, 812 F.2d at 113, 116–17; *see also, e.g., Westinghouse Elec. Corp.*, 638 F.2d at 577. This is especially so when the *ability* to seek care is jeopardized by a violation of privacy rights. *Whalen*, 429 U.S. at 600, 97 S.Ct. at 876–77.

In contrast to much of the material above, this court concludes that the information about psychological consultations was the sort that the Scheetzes might reasonably have expected to keep private. With the only identified source, the investigative report, kept entirely within the Police Department, and with no outward indicia of the existence of a lack of counseling, there would not have been a waiver by disclosure. Moreover, the sensitivity of medical information warrants significant protection. This provides the strongest support for the Scheetzes' claim.

### iii. Balancing

After comparing the competing constitutional claims, this court finds that the defendants' claims prevail. First, Press Clause claims are weightier than privacy claims. First Amendment rights are fundamental, and attempts to punish the content of speech, as this use of 42 U.S.C. § 1983 would, are strictly scrutinized. In contrast, the Court has embraced privacy rights more tentatively. The leading case, *Whalen*, appeared to use a rational basis test, though it stated no explicit standard, and our Court of Appeals has used an intermediate scrutiny/sliding scale test to evaluate privacy claims. For the most part, the plaintiffs' privacy claims are of confidentiality, more peripheral than the *Griswold*-based autonomy claims. Given these different levels of scrutiny, this court must accord the First Amendment claims more deference than the privacy claims.

The actual claims made also weigh in favor of the defendants. The articles concerned the conduct of the Allentown Police Department, with its treatment of Officer Scheetz as the focus. Most of each article was directed toward the Police Department's conduct, not Officer Scheetz's. This type of speech—comment on public affairs—goes to the core of the First Amendment. The privacy claims are gen-

---

**27.** The plaintiffs argue that the lull in discussion of the incident, as shown by the deposition testimony, shows that the incident was no longer a prominent event. *See, e.g.,* Koons Dep. at 28; Bosha Dep. at 37–40. More likely, though, the matter was discussed only when there was some occasion to do so—first when it occurred, and then when Mr. Scheetz received his award. As Ms. Bosha, then a civilian employee of the Police Department, observed, the beating was "public knowledge." Bosha Dep. at 40.

erally weaker. Much of the information had long been the subject of departmental gossip, which provided the basis for Mutchler's initial interest. Some was even a matter of public record (the information on the incident report). Although this court agrees that the contents of the investigative reports are entitled to privacy protection, insofar as they have not become common knowledge, the extent of the privacy right does not reach that of the First Amendment right advanced here.

The autonomy claims fall nearer the borderline. Seeking medical treatment is part of the core of the privacy interest, and the threat of continued publicity for any future visits to a psychologist could deter the Scheetzes from seeking assistance. Moreover, there is no evidence that the facts about psychological assistance had been publicized before the stories. The First Amendment rights remain strong, but the rationale is weaker. Mr. Scheetz's early refusal to seek assistance does, however, add weight to the charge, implicit in the article, that he should not have received the award and that the Police Department should have taken sterner measures. Similarly, mentioning the couple's later appointment with a counselor could be justified as an attempt to balance the portrayal of both Scheetz and the Department or as background for a further indictment of Chief Stephens, who stated that he had not followed up his queries to insure that the couple had kept the appointment or that they had continued to secure assistance.

With a stronger privacy interest and a weaker First Amendment rationale, the defendants' decision to release these facts is less easily supported. Nevertheless, this court finds for the defendants here as well. Even if the justification is weaker, it is still real, and the speech of which it is a part still rests at the core of the First Amendment. Given this, and given the extra weight that this court must give First Amendment claims, even the stronger privacy claims cannot succeed.

Two general comments are appropriate here. First, though this court finds that the newspaper was legally justified in publishing the facts about psychological treatment, it does *not* find that the newspaper *should* have published them. The marginal benefit was not immense, and the potential for harm was significant. Newspapers, no less than other actors in our society, must bear in mind the consequences of their actions. Those involved with these stories should have thought long and carefully before they chose to release this information. However, this court must use its hindsight sparingly; as one court put it, "[e]xuberant judicial blue-penciling after-the-fact would blunt the quills of even the most honorable journalists." *Ross v. Midwest Communications, Inc.*, 870 F.2d 271, 275 (5th Cir.1989) (Higginbotham, J.). This is at least implied by the pronounced deference that the Court has given the press on matters of public import. Were this court one of manners or ethics, it might well reprove the defendants; because it is one of law, it cannot.

Second, this test should allay the fears expressed by the defendants that allowing civil sanctions for the publication of truthful information would, for example, have kept Watergate from the public eye. This court agrees that our society is nourished by investigative journalism, and it agrees that a rule of law that chilled investigative journalism would be unwise. However, the balancing test that this court has set forth does no such thing. When the press reports on matters of public import, its reports are protected by the core of the First Amendment. Only the most compelling of countervailing interests could possibly yield liability.[28]

This test does grant greater protection where the story rests in the facts it reveals, rather than in the public situation it illuminates. This sort of story lies far from the core of the First Amendment, and thus privacy claims may well prevail. Sup-

---

**28.** For example, President Nixon would have lost a suit against Messrs. Woodward and Bernstein; the information they produced could not possibly have rested nearer the essence of the First Amendment, so what limited confidentiality claims Nixon could have advanced would have been defeated.

pose, for example, that a newspaper conspired with a Health Department official to obtain a list of those who had tested positive for HIV, and then published the list. The privacy interest would be compelling, both under the confidentiality prong and under the autonomy prong. For the former, health records, as discussed above, fall well within the range of privacy; for the latter, one would be less likely to seek state assistance when one was concerned about the possibility of AIDS if one knew that the state's records could be found on the pages of the next day's newspaper. Thus, the courts have uniformly found strong privacy rights when individuals have brought § 1983 actions against the state for releasing HIV test results. *See, e.g., Doe v. Borough of Barrington,* 729 F.Supp. 376, 384–85 (D.N.J.1990); *Woods v. White,* 689 F.Supp. 874, 875–77 (W.D.Wis. 1988). This court would have no trouble finding for the plaintiffs in that case, were the defendants to file a summary judgment motion.

But that is not the case before this court. In this case, with, on one side, a much stronger First Amendment interest, and, on the other, a weaker privacy interest, this court must reach a different result. Accordingly, this court finds that the defendants are entitled to summary judgment on Counts I and V of the complaint. Because these counts provide the entire basis for federal jurisdiction over Counts II, III, IV, VI, VII, and VIII of the complaint, these shall be dismissed without prejudice.[29]

## II. MOTIONS TO COMPEL AND TO DISMISS

 Although Doe is the sole remaining defendant, the motion to compel remains open. Here, the countering motion, filed by the erstwhile defendants,[30] is a motion to dismiss. Their argument is based on this court's earlier ruling that

Doe could remain a defendant until a reasonable time for discovery had elapsed. They maintain that the plaintiffs have had more than ample discovery, and yet have not managed to name Doe. As a result, they argue, Doe must be dismissed.

The plaintiffs argue that, though a great deal of discovery has taken place, one critical piece—the subject of the motion to compel—has not. Clearly, the material sought would solve the problem set forth by the former defendants. Thus, argue the plaintiffs, the motion to compel must precede the motion to dismiss. The plaintiffs raise a valid point; again assuming that Mutchler were to obey an order compelling her to divulge her source, the plaintiffs could amend the complaint to name Doe. However, they shall not prevail on the larger question: whether Doe can remain in the action.

The basis for dismissal arises from the due process problems to which this court adverted in its earlier opinion on the validity of Doe defendants. *Scheetz,* 130 F.R.D. at 37. Until Doe is identified, all actions that anyone takes in this case are *ex parte.* This was not a great problem when other defendants sharing Doe's interests could effectively represent Doe. Now, though, the sole defendant has not received the complaint, appeared by counsel at depositions, or argued his case through motions or in person. It is quite possible that Doe has actual notice of at least some of the proceedings in this case. But this differs by far from the type of notice that comports with the requirements of due process.

This court's earlier opinion is not to the contrary. In most of the cases in which fictitious defendants have been found permissible, other identified defendants were also parties and could represent the evanescent defendant's interests. *See, e.g., Abels v. State Farm & Cas. Co.,* 770 F.2d 26,

---

**29.** Even though, at the moment, Doe remains in this action, this court cannot exert pendent party jurisdiction under 42 U.S.C. § 1983. *Aldinger v. Howard,* 427 U.S. 1, 17, 96 S.Ct. 2413, 2421–22, 49 L.Ed.2d 276 (1976).

**30.** Morning Call and Mutchler, no longer in this action, may have no standing to move to dis-

miss Doe. Even if this is true, it is irrelevant; this court has a continuing obligation to question its own jurisdiction, and I can, on my own motion, dismiss an action if I find my jurisdiction wanting. Especially in light of Doe's obvious inability to move on his or her own behalf, this court sees no difficulty in acting here.

31–32 (3d Cir.1985); *Varlack v. SWC Caribbean, Inc.,* 550 F.2d 171, 174–75 (3d Cir. 1977); *Bufalino v. Michigan Bell Tel. Co.,* 404 F.2d 1023, 1028 (6th Cir.1968); *Fludd v. United States Secret Service,* 102 F.R.D. 803, 805 (D.D.C.1984). Alternatively, as in *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the defendants were officials sued in their official capacity. Consequently, the agency employing them would have been served with process and would have represented their interests. Here, there has been no such notice or representation; the Scheetzes never served the City of Allentown or its police department with the complaint, even though Officer Doe has, from the start, been identified as an employee of the City of Allentown. Complaint, ¶ 7. Therefore, it would be inappropriate for this action to continue against Doe.[31] This court shall thus dismiss Doe from the action.[32]

## III. CONCLUSION

To summarize, this court agrees with the plaintiffs that newspapers may be held civilly liable for the publication of truthful information unlawfully obtained. It also agrees that, given the incomplete record, summary judgment is not warranted over the elements of a § 1983 action. It is only at the final step that this court parts company with the plaintiffs. Because this action pits one constitutional right against another, as is inevitable in a § 1983 action against the media, this court finds that the best approach is to balance the rights, taking account of the importance of each right and of the extent to which the behavior in question is protected by each right.

The articles present information that, almost without exception, goes to the core of the First Amendment—comment on public affairs, and, in particular, on public misconduct. Moreover, First Amendment rights are fervently guarded by the courts. The Scheetzes, on the other hand, have a relatively modest privacy interest in most of the facts at issue, and the courts have not granted privacy rights the same deference as First Amendment rights. This court must thus find for the named defendants. Due process requires that Doe be dismissed as well.

This decision has not come easily. Indeed, at oral argument this court stated that it was inclined to grant the motion to compel. This difficulty comes in part because, when two rights collide, one must suffer; thus, the Scheetzes, already deprived of their constitutional right to privacy, are deprived of redress as well.[33] This court sympathizes with the Scheetzes. As this court stated above, whether the defendants should have released the information about Mr. Scheetz's initial unwillingness to see a psychologist and the couple's later resort to one is very questionable as a matter of propriety. Just because we possess rights does not mean that we must exercise them to the hilt at every opportunity; though we enjoy rights to free speech, we would be ill-advised to celebrate them by vilifying each other on the slightest pretext. Whatever this court thinks of parts of the defendants' behavior, though, it would be false to the precepts of our Constitution if it permitted this action to

**31.** Furthermore, the plaintiffs should not be able to secure by pleading Doe initially what they cannot secure by Federal Rule of Civil Procedure 15. Had this court held that Rule 15 provided the sole means for adding parties to an action, this section of this opinion would be superfluous; the two real defendants would have disappeared, and the case would be closed. When this court allowed the complaint against Doe to proceed, it did not intend to allow the plaintiffs to circumvent the principles behind the Federal Rules of Civil Procedure. Because the plaintiffs cannot meet the requirements of Rule 15(c) on relation back of amendments (because there was no mistake about the identity of the proper party), allowing this complaint to proceed would create a gap in which there would be no tangible defendant. However liberal our Rules, they do not contemplate a plaintiff proceeding without a defendant, save in the most extraordinary of circumstances (for example, temporary restraining orders; and those expire in short order).

**32.** Of course, this dismissal is without prejudice to raise these claims should Doe be identified.

**33.** Though they retain their state law causes of action against Mutchler and Morning Call, as well as any claims they may have against Doe.

proceed. The prospect of vast liability would chill journalism in a manner too dangerous to accept.

John Marshall, in a passage quoted approvingly by James Madison, addressed this subject in a day when the press took even greater delight in flaying public officials than does ours. I can think of no better conclusion than to adopt his words.

Among those principles deemed sacred in America, among those sacred rights considered as forming the bulwark of their liberty, which the Government contemplates with awful reverence and would approach only with the most cautious circumspection, there is no one of which the importance is more deeply impressed on the public mind than the liberty of the press. That this *liberty* is often carried to excess; that it has sometimes degenerated into *licentiousness*, is seen and lamented, *but the remedy has not yet been discovered. Perhaps it is an evil inseparable from the good with which it is allied; perhaps it is a shoot which cannot be stripped from the stalk without wounding vitally the plant from which it is torn. However desirable those measures might be which might correct without enslaving the press, they have never yet been devised in America.*

6 *Writings of James Madison, 1790–1802* 336 (G. Hunt ed. 1906) (emphasis in original).

An order follows.

### ORDER

AND NOW, this 1 day of October, 1990, upon consideration of defendants' The Morning Call, Inc. and Mutchler's motion for summary judgment, motion to dismiss, motion in limine, and motion for a protective order, the plaintiffs' motion to compel discovery, and the responses thereto, IT IS ORDERED that:

1. The motion for summary judgment is GRANTED IN PART and DENIED IN PART. Judgment is entered in favor of defendants The Morning Call, Inc. and Mutchler and against the plaintiffs on Counts I and V of the complaint.

2. Counts II, III, IV, VI, VII, and VIII are DISMISSED without prejudice for want of jurisdiction.

3. The motion to dismiss is GRANTED. Defendant Doe is DISMISSED from this action.

4. All other motions are DISMISSED as moot.

5. The clerk is ordered to close the docket of the within case for statistical purposes.

### APPENDIX A

### POLICE DIDN'T INVESTIGATE ASSAULT COMPLAINT AGAINST OFFICER

#### By TERRY MUTCHLER

#### Of The Morning Call

Allentown Police Officer Kenneth L. Scheetz Jr., honored as the city's officer of the year, was accused last year of assaulting his wife. But Police Chief Wayne T. Stephens said the incident was not investigated.

Stephens confirmed that Allentown police policy requires an investigation be done if an officer is accused of misconduct or a crime.

A police report dated Jan. 14, 1988, stated that Rosanne Scheetz left her home at 2612 S. Appel St. about 10:10 p.m. that day after her husband assaulted her.

She returned home about an hour later and was beaten again by her husband, the police report stated.

Sgt. Michael Popovich, who took Mrs. Scheetz's statement, said in the report she "had visible facial injuries, black and blue eyes, laceration left forehead, laceration left cheek and complained of lumps and pain in the back of the head."

When Mrs. Scheetz appeared at police headquarters with the injuries, police let her spend the night in the shift commander's office because the Turning Point and Salvation Army shelters were full, according to the police report. It could not be determined whether she received medical attention.

The police chief, who initially denied knowledge of the incident but later confirmed it, suggested that Mrs. Scheetz may have overstated what took place.

"Did you ever think that people fake it?" Stephens asked. "Like women that tear their dresses and rip their bras and say they were raped? Now I'm not saying that happens all the time."

Stephens said, "To one person it's a gaping wound, to another it's a scratch," he said.

No charges were filed against Kenneth Scheetz, an 11–year police veteran. Mrs. Scheetz did not press charges, and she did not file for a protection-from-abuse order.

Allentown police policy requires that an investigation be done if an officer is accused of misconduct, but, Stephens said, "There was no investigation."

When asked why, Stephens replied, "I can't tell you that," adding that "other things" are involved.

Stephens said he could not explain further because it would breach police confidentiality.

According to the Jan. 14 report, Officer Robert Nickisher responded to a domestic disturbance call at the Scheetz home about 10:15 p.m. When he arrived, Mrs. Scheetz was gone but Mr. Scheetz was inside. Nickisher asked for a sergeant to come to the scene. Popovich responded.

"Mr. Scheetz appeared to be 100 percent rational and in [the] process of fueling his coal stove," Popovich wrote. "Mr. Scheetz indicated that there is no problem."

Popovich reported that Scheetz's right index finger was cut but that Scheetz did not say what happened. Police told Scheetz to call them if a problem arose.

About 1½ hours later, the report said, Mrs. Scheetz went to police headquarters and told Popovich she left her home after being assaulted by her husband at 10:10 p.m. She had returned home about 11 p.m. and was assaulted again, the report said.

"During conversations with Mrs. Scheetz, [it was] determined that assaults have occurred before," the report stated, noting that she said her husband refused to seek counseling.

Eight days later, Stephens spoke with Scheetz about the incident.

"He stated to me that he and his wife were going for counseling ... on Jan. 26," Stephens wrote in the report. When asked if he met with Scheetz subsequently, Stephens said no.

Assistant Chief Gerald M. Monahan Jr. said police may not have pressed charges for a number of reasons. An officer is not required to arrest an accused assailant, he said, but has the option to make an arrest if he believes it is merited.

Under the state Domestic Violence Act, which is Section 2711 of the Pennsylvania Crimes Code, if physical evidence exists, an arrest can be made without the victim's consent.

And Allentown Police Department policy states that a decision to arrest will be made without consideration of marital status, sexual orientation, denial by either party that abuse occurred, or the social, political or professional position of the accused batterer.

Monahan noted that an officer, in order to make an arrest, must believe that the victim is in danger.

"We had no complaints by anybody involved [that charges were not filed]," he said.

The city honored Scheetz as 1988's officer of the year at a ceremony in City Hall last week, and the South Allentown Optimist Club honored him May 2.

When he and his wife were approached for an interview after the ceremony last week, Scheetz said "no." He held his wife's hand and walked away.

Stephens, in an interview, at first denied knowledge of the assault. "I have no idea about that," he said of the incident.

When a reporter read to him a portion of a report with his signature, he said: "How did you get that? That's what I want to know."

"Who's giving you this?" he asked. "This man does an excellent job at work. This is a low blow. Who are your sources? If it's an anonymous caller, I have no respect for them. I don't have a comment."

He said he would not confirm or deny the incident, but in a later interview he confirmed that the incident happened.

Stephens stressed that Scheetz was selected officer of the year on the basis of his police work, not on his personal life. "The first thing, he's really dedicated to the community and the police department," Stephens said in the interview. "He has a tremendous record. He set an example for other policemen."

"He has never been sick and [is] always punctual," he said. "I started looking into some of the records over the years, and he was an excellent choice."

He said Scheetz's personal life has not affected his professional career.

When asked if the reported assault was a factor in deciding whether to honor Scheetz, he said, "It didn't even cross my mind.

"I don't think it's in his personnel file, but I didn't go over and look at it," he said.

Stephens said he was considering the report from which The Morning Call obtained the information on the Scheetz incident to be "stolen."

"It's a stolen report, and the person that showed it to you is a thief," Stephens said. "I want the readers to know that and let them decide the credibility [of it.]"

Stephens said he was not implying that The Morning Call illegally obtained the report but that someone in the department had taken the report.

When asked for a copy of the report, Stephens and Thomas C. Anewalt, city solicitor, said investigative supplements are not public record.

"If we were to allow access to investigative supplements, there would be conceivably all kinds or all types of suspects and cases that would be divulged," Anewalt said. "I don't think it was an action by an official agency of the government," he said. "The filling of what is known as a lead sheet is not a decision of the agency, i.e., municipal government."

Malcolm Gross, The Morning Call's counsel, said he believes the city failed to comply with the public records provision of the law in not releasing the full report. "In my opinion, they are public record," he said. "Under Pennsylvania law, components of decisions are public record once the decision is made."

Stephens stated that domestic abuse is a crime. "But," he said, "there are different degrees."

"I didn't name him officer of the year for anything but for his performance at work," the chief said.

"The bottom line is we're battling with druggies and community problems every day, and now I have to justify an incident that may or may not have happened because of a jealous policeman that didn't get the award?"

Stephens noted that things are "not often as they seem," offering three theories to explain the incident: The Morning Call may have obtained only selective information; the incident may not have been as severe as the report indicated, or the victim may have overstated the problem.

Stephens said Scheetz was chosen from among his peers for his performance and the example he set for colleagues during 1988.

Stephens said several officers and some of Scheetz's supervisors nominated him for the award, adding that he has "good support of the police department."

"When Scheetz arrives in the office in the mornings, he goes right to work," a letter of nomination stated on Scheetz's behalf. "He works one of the fullest eight-hour days in this police department."

"[He] is certainly an asset to the Allentown Police Department," a colleague wrote in nominating him for the honor.

"In my opinion, [he] is well-deserving of any promotion to sergeant that may become available. I respect his abilities and

job performance and would like to see a well-qualified man get some recognition for a job well done."

Lt. Raymond Ettinger, one of Scheetz's former superiors, commended Scheetz, adding, "I have no problems with him at all."

Former Police Chief David Howells Sr. called Scheetz a "good police officer."

"There are 173 officers on the force," said Lt. Thomas Kolowitz, Scheetz's immediate supervisor. "If everybody would do their work like Kenny does his, we wouldn't have half the [criminals] walking around on the street. They'd be in prison."

## APPENDIX B

### CHIEF SAYS BEATING REPORT INVESTIGATED LIKE OTHERS

Allentown Police Chief Wayne Stephens denied yesterday that there wasn't an investigation into a woman's report that her husband, a city policeman, had beaten her.

Stephens said a story in The Morning Call yesterday reflected a "misunderstanding" about his investigation of an assault reported by the wife of Kenneth Scheetz, who this month was named police officer of the year.

The story quoted Stephens as saying the Jan. 14, 1988, incident was not investigated.

Stephens said he thought when he was interviewed for the story that he was being asked whether he personally investigated Mrs. Scheetz's report.

"The answer is no, but there was an investigation done, as the article itself showed ..."

Allentown Mayor Joseph S. Daddona said that based on his discussions with Stephens, he is convinced that everything the chief did was proper.

"It was a strictly internal matter that the chief handled in accordance with the law," the mayor said.

Daddona said he was advised by city solicitor Thomas C. Anewalt that he could not discuss the steps taken by the police after the report was filed.

He said he would like to discuss the issue publicly, so that it would be clear that no one attempted a cover-up. However, he said, he could not.

Stephens said his comments were restricted because he must maintain Scheetz's confidentiality.

Several women telephoned the chief yesterday and expressed outrage at his stance on women's issues, Stephens said.

"This police department investigates every report," Stephens said, "and they are handled the same for every citizen, including police officers. This casts a shadow; we don't want women in fear. We will do our duties and protect them at all costs."

Said Stephens: "I do believe there are more rapes than are reported and I would encourage women to report them."

Rosanne Scheetz left her home the night of the assault, and when she returned later she was beaten again, the police report said.

She "had visible facial injuries, black and blue eyes, a laceration left forehead, laceration left cheek and complained of lumps and pain in the back of the head," the report said.

Mrs. Scheetz appeared at police headquarters with the injuries, made the report, and was allowed to spend the night.

Stephens would not comment further on his claim that the Scheetz incident was investigated. Mrs. Scheetz filed no charges, nor did police.

For the last 18 months, Scheetz has functioned well on the job, Stephens said, and his performance merited the annual award.

Stephens said he had no doubts about Scheetz's ability to handle his job, even if he was called to a domestic dispute.

"If we thought there was going to be a problem with his performance, or anyone else's, certainly we would take steps," he said.

"I have been on the Challenges program on TV (Channel 69) about domestic violence and have worked with Turning Point's 6th Street shelter," he said. "Working with

domestic violence is not a reaction to this story, but an ongoing way of life for me."